BARBARA OSBORN ET AL., APPELLANTS, V. KRISTI J. KELLOGG AND NEBRASKA EQUAL OPPORTUNITY COMMISSION, APPELLEES.

547 N.W.2d 504

Filed May 7, 1996. No. A–94–1227.

Thomas R. Lamb and Amie C. Martinez, of Anderson, Creager & Wittstruck, P.C., for appellants.

Jeffrey S. Schmidt, of Burns & Associates, for appellees.

HANNON and MUES, Judges, and WARREN, District Judge, Retired.

WARREN, District Judge, Retired.

Kristi J. Kellogg filed a complaint with the Nebraska Equal Opportunity Commission (NEOC), alleging racial discrimination in housing against Barbara Osborn, Keith Osborn, and Pam Lyman (hereinafter referred to as the Osborns). Kellogg claimed that the Osborns denied her rental application because her live-in boyfriend was black. The NEOC found for Kellogg,

and the judgment was affirmed by the Lancaster County District Court. The Osborns now appeal to this court.

## FACTUAL BACKGROUND

Kellogg, the complainant in this action brought under the Nebraska Fair Housing Act, is a 31-year-old white female and the mother, by a previous relationship, of Mindy, an 11-year-old girl. Kellogg's boyfriend is James Greene, a 41-year-old black male. Two of the defendants are Keith Osborn and Pam Lyman, husband and wife, who own the house located at 240 North 31st Street, Lincoln, Nebraska, that Kellogg and Greene attempted to lease. Keith and Pam live in Illinois. Barbara Osborn, Keith's mother, is the remaining defendant, who manages Keith's property in Lincoln.

Both Kellogg and Barbara work at the Nebraska Department of Motor Vehicles (DMV). On May 4, 1993, Barbara overheard Kellogg talking to two coworkers about how hard it was for her "to find a place that accepts pets." Barbara then went to Kellogg's desk and gave her a note which reads as follows: "Chris [sic], I have a lower half of house at 240 No. 31st. Back yd all fenced (almost). Dog okay if mature. Yardwork, water & sewer & garbage pd. 1 yr lease $375[.]" The note was signed "Barb." Kellogg testified that she read the note and asked Barbara how many bedrooms it had, to which Barbara replied that it had one. Kellogg further testified that she told Barbara that she needed two bedrooms because her boyfriend and child would also be living there. According to Kellogg, Barbara then said: " 'Well, the people that lived there before used the laundry room as a bedroom, and two children slept in the basement.' " Kellogg also testified that Barbara "said it would be workable, that we could work something out."

The Osborns' house at 240 North 31st Street is separated into two parts, the upper half, which is leased separately, and the lower half, which Kellogg and Greene desired to rent. The lower half of the house contains only one bedroom and one bathroom. There is evidence in the record, however, that past tenants have used both the laundry room and the basement as bedrooms, despite the Osborns' contention that the basement is not habitable.

At 4 p.m. on May 4, 1993, Kellogg and Barbara met at the house so that Kellogg could view the premises. Kellogg testified that Barbara asked if Kellogg's boyfriend "could fix the fence, because half of it was down, and keep the gutters clean," to which Kellogg replied affirmatively. Before leaving, Barbara gave Kellogg the key to the house so that she could bring her boyfriend over after Kellogg got off work from K mart, where she worked part time.

Kellogg returned to the house with Greene at approximately 10:30 that night. According to Kellogg, they spent about 15 minutes inside the house. A neighbor, Clyde Zweerink, who told Barbara that he would keep an eye on the vacant lower half of the house, saw that the lights were on and that the curtains were moving. As a result, Zweerink went over to startle whoever was inside the house. Kellogg apparently was standing between the closed screen door and the open inner door, trying to get the key out of the inner door, when she observed Zweerink through the screen door. Kellogg screamed, and Greene ran from the living room to her aid, stopping somewhere behind and off to the side of Kellogg. Greene testified that he was able to see a white male through the screen door. Zweerink, however, testified that he did not see anyone besides Kellogg, even though the lights were still on inside the house. After being told by Kellogg that she had Barbara's permission to be there, Zweerink returned home, where he continued to watch the house from his porch. Zweerink testified that he saw two to three figures leave the house but was unable to identify them or their race.

The following day, Kellogg and her daughter, Mindy, met Barbara at the house. While Kellogg showed Mindy around, Barbara, according to Kellogg, went over to Zweerink's house to see when he was going to fix the garbage disposal. When Barbara came back over, she gave Kellogg two applications and told her that she would also need a deposit check, which according to Keith is standard application procedure and does not mean that an application has been approved. According to Kellogg, Zweerink came over 10 minutes later and started working on the garbage disposal. Barbara testified that she talked to Zweerink only about the garbage disposal.

Kellogg returned the completed applications with the deposit check on the morning of May 6, 1993. Kellogg testified that Barbara told her that Keith would make the final decision. On May 8, Kellogg received a letter from Barbara, dated May 7, 1993, rejecting their applications. The reasons proffered were as follows:

> Although you're a really nice girl, we like to limit the number of people residing at any one residence to no more than three total. This is based on 30 years experience. With the tenant upstairs already in residence now for four years, the total with your applications would come to four people. Also, we feel because the downstairs unit has only one bedroom, there really isn't room for three people to be satisfied for very long of a time. Therefore, we try to rent to only one person in that unit and not more than two people.

> Although I have never met your boyfriend, and no references were proficed [sic] on his application form, his income wouldn't be sufficient to cover the expenses should anything happen to you, i.e., severe illness or loss of employment.

At that point in time, both Kellogg and Greene had already given notice to their landlords that they would be moving, believing that they already had the lower half of the Osborns' house rented. As a result of being pressed for time, Kellogg and Greene signed a year lease for another place that was $75 higher in rent per month ($450 compared to $375), although it is undisputed that it also had superior facilities.

On her rental application, Kellogg listed that between her two jobs at the DMV and K mart, both of which she had worked for during the past 6$\frac{1}{2}$ years, she earned approximately $1,700 per month. Kellogg listed both bank references and credit references. Furthermore, although she had a pet dog, she stated on the application that she agreed not to bring or allow pets on the premises without written permission. On his rental application, Greene, who worked at Weathercraft Roofing as a roofer, listed his income at $800 per month. However, Greene did not list any bank or credit references. We note that the application did not inquire as to the race of the applicant.

On May 16, 1993, the Osborns leased the house to Huishen and Ying Li. On the Lis' application, they listed that, in addition to themselves and their 10-month-old daughter, two of their parents who were "visiting [the] U.S. for [a] short stay," would be residing with them. Furthermore, they listed their income at $20,500 per year. We note from their application that only Huishen was employed and that together they had no credit references. The record also contains the lease of Jimmy and Angelique Suggett, dated January 28, 1993, for the same property. The Suggetts, who also had one child, listed no bank or credit references in their rental application. Only Jimmy was employed, earning a wage of $6.25 per hour.

At trial, Keith testified that although his mother screens the applicants, he reserves the final decision. However, Keith further testified that he did not make the final decision in Kellogg's case. According to Keith, on May 4, 1993, he had a conversation with Barbara in which she stated that she might have someone interested in renting the house. Keith testified that he talked with Barbara again on May 6, in which conversation he learned that she had received a deposit for the house. At trial, Keith confirmed that it was his mother's decision to not accept the applications, based on his advice and that of others. According to Keith, he told Barbara that due to property damage from the pets of past tenants he "in no way, shape, or form" wanted to rent the house to anyone who had a pet. Keith also claimed that he told his mother that he did not care whether the property sat empty for 6 months because he wanted somebody who had good credit references, a good job, and did not smoke. The record also demonstrates that Keith was concerned with the habitability of the basement.

At trial, Barbara claimed that it was not until May 5, 1993, that she discovered that Kellogg's boyfriend would be renting the house with Kellogg. Barbara further claimed that she did not learn that Greene was black until the week after she rejected Kellogg's application. Barbara also insisted that she never talked with Zweerink about anything except the garbage disposal on May 5. When asked whether she had talked to Keith about Zweerink's having seen Kellogg's boyfriend, she replied, "No. His name never came up. Never." When Keith was asked

whether his mother said anything to him that indicated that she knew that one of the applicants was black, Keith replied, "Never." Keith claimed that he did not find out about Greene until weeks later when his mother told him that Kellogg was telling people at work that her application was rejected because Greene was black. Keith also claimed that he did not have any information that the neighbor, Zweerink, had seen a black man.

At trial, Barbara explained that in her letter she listed only the four most remote reasons for rejecting Kellogg's application because Barbara wanted to be nice to Kellogg. Barbara claimed that there were in fact at least 16 reasons for rejecting Kellogg's application, though she could only list the following reasons in addition to those given in the rejection letter: (1) She did not want two unmarried people living together because she felt that it was morally wrong, although her son and his wife lived together before their marriage; (2) Kellogg wanted two bedrooms and a shower, both of which the lower half of the house did not contain; (3) Kellogg had a dog, which both Keith and a terminally ill neighbor requested that the new tenant not have; (4) Kellogg proved unreliable and untrustworthy because she "played sick" from work, did not return the key to the house as requested, and returned the applications and deposit during work hours at the DMV, contrary to Barbara's instructions; (5) Greene had no credit references; (6) she had not met Greene and could not understand why a roofer would not get off work until 11 p.m.; (7) Greene's income was insufficient if Kellogg got sick or lost her job; (8) she did not want an unsupervised 11-year-old girl in the house; (9) the tenant upstairs did not want tenants downstairs who smoked; (10) Kellogg received a bad reference from her prior landlord; (11) Kellogg wanted to move in before June 1, 1993; and (12) Keith told her that he did not want a " 'bunch of singles' " living in the house.

Randall Chapp, an investigator for the NEOC, interviewed Keith over the telephone regarding Kellogg's rejection. At trial, Investigator Chapp testified as follows:

> I asked him if he was aware or if his mother was aware that the complainant's boyfriend was black prior to receiving the applications, and he said yes, mom had said

that Clyde, the neighbor across the street, had told her that the complainant and a black man had been looking at the house late at night and that — he went on to say that she was not aware that the black gentleman was going to be part of the renters in the house until after she had received the applications from the complainant and then realized that the black man was her boyfriend.

Investigator Chapp also testified, contrary to Keith's earlier testimony, that Keith told him that although he set guidelines for his mother, all decisions regarding applications were made by his mother. With Keith's permission, Investigator Chapp taped that phone conversation, the relevant part of which was offered into evidence and is as follows:

MR. CHAPP: Did your mother say anything about [Kellogg's] boyfriend being black?

MR. OSBORN: She mentioned that the neighbor who came over that evening to see who was going through the house mentioned that there was a black man with her, and I don't think that he even knew at first that that person was thinking of renting the apartment or anything like that. He was just basically checking out who was over there, and the lady said that, "Well, Barb gave me the key to look over the apartment to see about renting it."

MR. CHAPP: Okay.

MR. OSBORN: But he may have mentioned that there was a black man with this woman, but I had no idea at that time that this man would be involved in the renting of the property until the next day when Mom got the applications and stuff from this person.

Investigator Chapp testified that he also interviewed Barbara, who told him that she did not think that it was right that an 11-year-old girl should have to go through an unmarried couple's bedroom to use the bathroom.

The NEOC hearing examiner first concluded that Kellogg met her burden of establishing a prima facie case of housing discrimination, finding that Kellogg was a member of a protected class under the act by virtue of her association with Greene; that the Osborns were aware of Greene's race at least by May 6, 1993, when Kellogg returned the applications to

Barbara; that Kellogg applied for and was qualified to rent the subject property; that Kellogg was rejected for the housing; and that the housing opportunity remained available after her rejection.

The NEOC hearing examiner also concluded that the Osborns met their burden of articulating legitimate, nondiscriminatory reasons for rejecting Kellogg's application. Although the Osborns gave many reasons for rejecting Kellogg's application, the NEOC hearing examiner found that only the following six reasons were legitimate, nondiscriminatory reasons for their action: (1) The Osborns wanted to limit the total number of people in the house to three, (2) there was insufficient space for three people to live in the lower half of the house, (3) Greene did not list any credit references and his income would be insufficient to cover expenses if Kellogg was unable to work, (4) Kellogg's dog was unacceptable, (5) Kellogg and Greene were not married and Mindy would have to pass through their bedroom to get to the bathroom, and (6) the upstairs tenant did not want any downstairs tenants who smoked.

Lastly, the NEOC hearing examiner concluded that Kellogg met her final burden of proving by a preponderance of the evidence that the reasons offered by the Osborns were not their true reasons, but were, instead, a pretext for intentional housing discrimination. The NEOC hearing examiner found the following as evidence of pretext:

1. Ms. Osborn's testimony that she wanted to limit the total number of occupants in the whole residence (upper and lower units) to three (3); yet she rented to the Li family which had five (5) members; and she also rented to the Suggett family which had three (3) members, just as the Complainant's family did.

2. Respondents' requiring two (2) separate rental applications from the Complainant and Mr. Greene, while only requiring one (1) from the Li Family and Suggett Family.

3. Respondents' requirement that the Complainant have a. secondary source of income, when no such demand was made upon Ying Li or Jimmy Suggett. Complainant's total

income was approximately $20,000.00 per year, which was about the same as Ying Li's annual income. Mrs. Li was unemployed and provided no additional income. Jimmy Suggett's annual income was approximately $12,000.00, which was far less than the Complainant earned annually. Mrs. Suggett was unemployed and provided no additional income. Nevertheless, Mr. Greene's $9,600.00 annual salary was a secondary source of income for the Complainant. However, the Respondents still would not rent to her.

4. The Complainant had been on both of her current jobs in excess of six (6) years; Mr. Greene had been on his current job for approximately three (3) years; Ying Li had been on his current job for only one (1) year; and Jimmy Suggett had been on his current job for only nine (9) months.

5. Respondents' rejection letter (Exhibit 2) mentions the lack of bank references and credit references on Mr. Greene's rental application (Exhibit 5) as a reason for the rejection. I specifically note that Ying Li's rental application (Exhibit 7) did not list credit references; Jimmy Suggett's rental application (Exhibit 8) did not contain either bank references or credit references. The Complainant's rental application (Exhibit 4) was complete with bank references, credit references and person references,yet [sic] she was rejected for the housing.

6. Ms. Osborn told the Complainant that the final decision on the applications would be made by Keith Osborn; however, Mr. Osborn testified that Ms. Osborn made the final decision on the Complainant's and Mr. Greene's applications.

7. Barbara Osborn's note (Exhibit 1) stating that a dog would be acceptable, and her subsequent usage of the existence of Complainant's dog as a reason for the rejection.

8. Ms. Osborn's attempt to shun responsibility for the rejection, by suggesting that the tenant in the upstairs unit did not want a smoker living in the lower unit.

9. Ms. Osborn suggested that the subject housing unit would be adequate for the Complainant's needs, by telling her that the people who lived there before had two (2) children sleeping in the basement, and something could be worked out. Complainant agreed that it was adequate and told Ms. Osborn that she would take the housing unit. Subsequently, in her letter of rejection, Ms. Osborn stated that there was not enough space for three (3) people to be satisfied for long.

The NEOC hearing examiner consequently ordered the Osborns to (1) pay Kellogg $900 (the difference in rent for the period June 1, 1993, to May 31, 1994); (2) cease and desist from maintaining the discriminatory housing practice of refusing to rent any house, duplex, or apartment to any individual on account of that person's race or race by association; (3) pay Kellogg $1,197.60 in attorney fees and costs; and (4) pay $2,000 as a civil penalty for the discriminatory acts committed by them against Kellogg.

The Lancaster County District Court, which reviewed the judgment de novo, adopted the findings of fact and conclusions of law of the NEOC hearing examiner and affirmed the decision.

## ASSIGNMENTS OF ERROR

The Osborns argue that the district court erred in finding that the NEOC's ruling was supported by competent, material, and substantive evidence in view of the entire record and in determining that the NEOC's ruling was not arbitrarily and capriciously made.

## STANDARD OF REVIEW

A judgment rendered or final order made by the district court pursuant to the Administrative Procedure Act may be reversed, vacated, or modified on appeal for errors appearing in the record. Neb. Rev. Stat. § 84-918(3) (Reissue 1994); *Ventura v. State*, 246 Neb. 116, 517 N.W.2d 368 (1994). An appellate court, in reviewing a judgment of the district court for errors appearing on the record, will not substitute its factual findings for those of the district court where competent evidence supports those findings. *Ventura v. State, supra.*

## ANALYSIS

The Nebraska Fair Housing Act, as codified at Neb. Rev. Stat. §§ 20–301 to 20–344 (Reissue 1991), went into effect on September 6, 1991, and is designed to prevent discrimination in the acquisition, ownership, possession, or enjoyment of housing throughout the State of Nebraska. See § 20–302. The test that a plaintiff, who alleges discrimination in housing, must satisfy in order to recover under the act was articulated by the Nebraska Supreme Court in *Ventura*, where the Nebraska Supreme Court looked to the U.S. Supreme Court for guidance, specifically to *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), all of which were employment discrimination cases.

■ The resulting standard is as follows: (1) The plaintiff must establish a prima facie case of discrimination; (2) if the plaintiff succeeds in so doing, the defendant has the burden of articulating a legitimate, nondiscriminatory reason for its action; and (3) if the defendant successfully rebuts with a legitimate, nondiscriminatory reason, the plaintiff must establish by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but a pretext for discrimination. *Synacek v. Omaha Cold Storage*, 247 Neb. 244, 526 N.W.2d 91 (1995) (age discrimination in employment); *Ventura, supra*.

*Kellogg's Prima Facie Case.*

■ In order to establish a prima facie case of housing discrimination, the plaintiff must prove by a preponderance of the evidence (1) that she is a member of a racial minority, (2) that she applied for and was qualified to rent or purchase the housing, (3) that she was rejected, and (4) that the housing opportunity remained available. *Ventura v. State, supra*. The plaintiff always retains the ultimate burden of persuasion. *Id.*

The NEOC hearing examiner concluded that Kellogg made a prima facie showing of racial discrimination in housing. While Kellogg is not a member of a racial minority, we note that she

qualifies as an "aggrieved person," as defined in § 20–304(1) as a person who claims to have been injured by a discriminatory housing practice. It is undisputed that Greene is a member of a racial minority. The evidence further shows that Kellogg applied for and was qualified to rent the house from the Osborns, as evidenced by the rental applications of the Lis and the Suggetts; that her application was rejected, which is undisputed; and that the housing opportunity remained available, which is also undisputed. We conclude that the district court did not err in adopting the NEOC hearing examiner's conclusion that Kellogg met her initial burden of production.

*The Osborns' Rebuttal.*

As set forth above, the NEOC hearing examiner found that the Osborns articulated only six legitimate, nondiscriminatory reasons for rejecting Kellogg, even though, at trial, the Osborns, Barbara in particular, proffered many more. We reiterate that in reviewing a judgment of the district court for errors appearing on the record, we will not substitute our factual findings for those of the district court where competent evidence supports those findings. *Ventura v. State*, 246 Neb. 116, 517 N.W.2d 368 (1994). Since competent evidence supports the findings of the NEOC hearing examiner, as adopted by the district court, we cannot say that the court erred in finding that only six of the Osborns' proffered reasons were legitimate. However, the Osborns carried their burden of production, and therefore, the presumption raised by the prima facie case is rebutted and drops from the case. See *St. Mary's Honor Center v. Hicks, supra.*

*Pretext for Discrimination.*

■ Kellogg must show that the Osborns' stated reasons were in fact a pretext for discrimination. The term "pretext" means pretext for discrimination; to establish that the proffered reason for the action taken by the employer was a pretext for discrimination, *the employee must show both that the proffered reason was false and that discrimination was the real reason.* *Synacek v. Omaha Cold Storage, supra.* Although *Synacek* was an employment discrimination case, we find that this pretext

standard applies to housing discrimination cases because of the Nebraska Supreme Court's earlier application of employment discrimination standards to housing discrimination cases. See *Ventura v. State, supra.*

The NEOC hearing examiner found that Kellogg proved by a preponderance of the evidence that the Osborns' seemingly legitimate reasons for rejecting Kellogg were, in fact, a pretext for intentional discrimination. Having viewed all the evidence, including Investigator Chapp's tape-recorded conversation with Keith, the rental applications of the Lis and the Suggetts, and the inconsistencies between the testimony of the Osborns, we conclude that competent evidence supports the NEOC hearing examiner's factual findings. We cannot say that the district court erred in adopting the findings of the NEOC hearing examiner, who concluded that the Osborns racially discriminated against Kellogg in violation of the Nebraska Fair Housing Act. We further find that the award of $900 to Kellogg for the increased cost of rent was supported by the evidence.

*Compensatory Damages.*

█ Lastly, Kellogg argues that she is entitled to an award of $25,000 in compensatory damages. However, the alleged error is not assigned in her brief, and her brief is not labeled as a cross-appeal as required by Neb. Ct. R. of Prac. 9D(4) (rev. 1996). To be considered by an appellate court, an error must be both assigned and discussed in the brief of the one claiming that prejudicial error has occurred. *Standard Fed. Sav. Bank v. State Farm,* 248 Neb. 552, 537 N.W.2d 333 (1995); *Pantano v. McGowan,* 247 Neb. 894, 530 N.W.2d 912 (1995). See, also, *Wellman v. Birkel,* 220 Neb. 1, 367 N.W.2d 716 (1985) (court did not consider appellee's argument because she neglected to cross-appeal and make assignments of error); *National Farmers Organization, Inc. v. McCook Feed & Supply Co.,* 196 Neb. 424, 243 N.W.2d 335 (1976) (court did not consider appellee's argument because there was no cross-appeal or assignments of error). As this argument has not been properly presented for our consideration, we need not address it.

## CONCLUSION

We conclude that the district court did not err in adopting the findings of fact and conclusions of law of the NEOC hearing examiner. The judgment of the district court is affirmed.

AFFIRMED.