Nebraska Supreme Court Online Library
www.nebraska.gov/courts/epub/
02/12/2016 08:24 AM CST

RGR Company LLC, appellant, v.
Lincoln Commission on Human Rights
on behalf of Lionel Simeus, appellee.

___ N.W.2d ___

Filed February 12, 2016.    No. S-15-076.

1. **Municipal Corporations: Equity: Appeal and Error.** An appeal of a case heard in district court under Neb. Rev. Stat. § 15-1201 et seq. (Reissue 2012) to the appellate court is to be reviewed as in equity.

2. **Equity: Appeal and Error.** On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court, provided that where credible evidence is in conflict in a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

3. **Civil Rights: Discrimination: Municipal Corporations: Equity: Appeal and Error.** An appeal filed in district court pursuant to Neb. Rev. Stat. § 15-1201 et seq. (Reissue 2012) from an order or decision of a human rights commission of a city of the primary class is to be heard as in equity, and upon appeal to the Nebraska Supreme Court, it is the duty of the court to try issues of fact de novo upon the record and to reach an independent conclusion thereon without reference to the findings of the district court.

4. **Appeal and Error.** When reviewing an appeal de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions on the matters at issue.

5. **Discrimination: Proof.** In a housing discrimination case, a court evaluates the evidence under the three-part burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

6. ____: ____. With the exception of summary judgments, under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), framework, (1) the plaintiff has the burden of establishing a prima facie case of discrimination; (2) if the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action; and (3) if the defendant successfully articulates a legitimate, nondiscriminatory reason for its action, to succeed, the plaintiff must prove by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but was instead a pretext for discrimination and that discrimination was the real reason.

7. **Discrimination: Intent: Proof.** In a housing discrimination case, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

8. **Discrimination: Proof.** The defendant's responsibility to produce proof of a nondiscriminatory, legitimate justification for its action is not an onerous task; it is a burden of production, not of persuasion.

9. **Discrimination: Proof: Words and Phrases.** The term "pretext" means pretext for discrimination; a defendant's reason for its action cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false and that discrimination was the real reason.

10. **Discrimination: Proof.** Although strong evidence of a prima facie case of discrimination can be considered to establish pretext, proof of pretext or actual discrimination requires more substantial evidence.

Appeal from the District Court for Lancaster County: Lori A. Maret, Judge. Reversed and remanded with directions.

Melanie J. Whittamore-Mantzios, of Wolfe, Snowden, Hurd, Luers & Ahl, L.L.P., for appellant.

Jeffery R. Kirkpatrick, Lincoln City Attorney, and Jocelyn W. Golden for appellee.

Heavican, C.J., Wright, Connolly, Miller-Lerman, and Cassel, JJ.

Miller-Lerman, J.

## NATURE OF CASE

On June 12, 2013, Lionel Simeus filed a complaint against RGR Company LLC (RGR) with the Lincoln Commission on

Human Rights (the Commission) for housing discrimination on the basis of race, nationality, and disability pursuant to 42 U.S.C. § 3604(b) (2012) of the federal Fair Housing Act and Lincoln Mun. Code § 11.06.020(b) (1991). The Commission determined that reasonable cause existed to believe that RGR discriminated against Simeus in the provision of housing on the basis of race and national origin. On October 31, the Commission, on behalf of Simeus, filed a charge of discrimination against RGR. A public hearing was held. On February 27, 2014, the Commission filed an amended final order finding against RGR and awarding various penalties and costs.

RGR appealed to the district court for Lancaster County. On December 23, 2014, the district court affirmed the Commission's amended final order. RGR appeals. For reasons more fully explained below, we determine that the Commission failed to prove that RGR's explanation of its negative treatment of Simeus was a pretext for discrimination and that the Commission did not establish that intentional discrimination was the real reason. Therefore, we reverse the decision of the district court and enter orders accordingly.

## STATEMENT OF FACTS

RGR owns a rental property located at 1315 D Street in Lincoln, Nebraska. Ryan Reinke is the sole owner of RGR, as well as various other business entities. There are 12 rental properties in Lincoln that are owned by Reinke or entities owned by Reinke. At the time relevant to this case, 75 tenants lived in the 12 rental properties.

Simeus is a black man from Haiti. On May 27, 2013, Reinke and Simeus met to discuss Simeus' renting an apartment in the building located at 1315 D Street. Simeus entered into a 1-year lease agreement with an agreed monthly rent of $385. The parties disagree about whether Simeus signed a lease. Despite requests from Simeus, Reinke did not provide Simeus with a copy of the lease, and there is not a signed copy of the lease in the record. Simeus resided in the apartment from June 1 through August 7.

Simeus noted that there were repairs that needed to be completed in the apartment. There was a hole in the bedroom wall. There were broken items, including a shower faucet, kitchen cabinets, and a stove with only one functioning burner. Simeus attempted to contact Reinke regarding the repairs by telephone and in person. Reinke did not answer or return Simeus' calls. Simeus stated that on or about June 5, 2013, he approached Reinke while Reinke was in his vehicle outside the apartment building, but instead of talking to Simeus, Reinke rolled up his car window and said, "'That's why I don't want to deal with you foreigners . . . .'" Reinke denies making the statement. However, Reinke acknowledges he rolled up the car window because he was in a conversion on his cell phone.

On June 6, 2013, Reinke gave Simeus a "Fourteen-Day Notice of Termination of Rental Agreement," which stated that Simeus was "in material noncompliance" of his rental agreement for the following reasons: "1. Burning candles, incense, or smoking within the premises[,] 2. Disturbances[,] 3. Argumentative or threatening other tenants[,] 4. Public intoxication."

On June 7, 2013, the police responded to a noise complaint regarding Simeus' apartment. Simeus spoke with the responding officer who asked him to turn his music down, and Simeus complied.

Reinke asserted that he delivered a second 14-day notice to Simeus sometime after June 6, 2013, but a signed copy of the second notice was not offered at the hearing, and a signed copy is not in the record. An unsigned copy of the second notice is in the record, and it stated that Simeus was "in material noncompliance" with the rental agreement for the following reasons: "1. Commons area damage by tenant or guest[,] 2. Replace advertising banner[,] 3. Failure to maintain building thermal efficiency when heat[ing] or cooling apartment." Simeus denied receiving the second notice.

Simeus filed complaints with the Commission on June 12, 2013, and with the U.S. Department of Housing and Urban Development on July 2, alleging that Reinke and RGR committed discriminatory housing practices on the basis of race, national origin, and disability, in violation of § 11.06.020(b) of the Lincoln Municipal Code, which describes acts which are unlawful regarding housing, and 42 U.S.C. § 3604(b) of the federal Fair Housing Act. On June 13, the Commission sent a notice of the filing of the complaint to RGR and Reinke. Reinke refused to claim the certified letter, so it was returned. On June 27, the sheriff served Reinke with the notice.

Angela Lemke, a senior civil rights investigator with the Commission, investigated Simeus' complaint. While the Commission was investigating his complaint, additional incidents occurred. On or about June 17, 2013, Simeus contacted the Lincoln's Building and Safety Department regarding perceived violations of the housing code in his apartment. A housing inspector inspected Simeus' apartment and noted that the leaking bathtub faucet constituted a code violation. The housing inspector sent RGR a letter dated June 17, 2013, which stated that the violation must be repaired by July 3.

On June 26, 2013, Simeus had left his apartment, and when he returned, the electricity was not working in his apartment. He contacted Lemke and notified her that his electricity was not working, and Lemke contacted the Building and Safety Department. A housing inspector from the Building and Safety Department determined that the issue was with the main breaker box in the hallway outside of Simeus' apartment, which was located in a locked closet. It was determined that Simeus' apartment was the only apartment in the building where the electricity was affected.

On June 27, 2013, Reinke entered Simeus' apartment to make repairs. Reinke did not provide Simeus with notice. That night, Simeus had taken medication to help him sleep, and he was asleep when Reinke entered the apartment and

completed the repairs. In an interview with Lemke, Reinke acknowledged that he completed the repairs while Simeus "was 'not alert.'"

On July 9, 2013, Reinke posted a "3 Day Notice of Breach of Lease Agreement" on Simeus' apartment door. The notice stated that Simeus owed $465, which was rent in the amount of $385 and a late fee in the amount of $80. The notice stated that if Simeus did not remedy the noncompliance by July 12, the rental agreement would terminate. Reinke brought an eviction proceeding against Simeus in the district court for Lancaster County in the separate case No. CI 13-8406. Simeus moved out of the apartment on or about August 7 without paying his rent for July.

Based on Lemke's investigation, the Commission determined that reasonable cause existed to believe that a discriminatory housing practice had occurred on the basis of race and national origin. Therefore, on October 31, 2013, the Commission, on behalf of Simeus, issued a "Charge of Discrimination" against RGR, pursuant to Lincoln Mun. Code § 11.02.070 (1996) and rule 2-(6.1a) of the Commission's rules and regulations. The charge alleged, inter alia, that RGR failed to respond to Simeus' requests for repairs in a timely fashion and that when Reinke did complete the repairs, he entered Simeus' apartment without notice and while Simeus was sleeping. The charge stated that timely repairs were made "to units occupied by tenants outside of [Simeus'] race and national origin" and that RGR failed to make timely repairs to an apartment "which houses a Black tenant of Ethiopian descent." Based on these facts, the charge alleged that RGR discriminated against Simeus on the basis of race and national origin.

Neither party elected to have the claims asserted in a civil action, so a public hearing was held before a hearing officer on December 4 and 5, 2013. Simeus, Reinke, and Lemke testified at the hearing. The Commission offered and the hearing officer received 17 exhibits. RGR offered and the hearing officer received 15 exhibits.

The hearing officer's "Findings of Fact and Discussion" were received by the Commission on December 19, 2013. Based on the evidence adduced at the hearing, the hearing officer determined that Reinke discriminated against Simeus on the basis of race or national origin. In making this determination, the hearing officer had found that (1) Reinke failed to make timely repairs to Simeus' apartment; (2) Reinke served upon Simeus a notice to quit the premises only 6 days after Simeus moved into the apartment; (3) Reinke, without notice, entered Simeus' apartment to complete repairs when Simeus was sleeping; and (4) Simeus was the only tenant who lost electricity on June 26, 2013, and "[i]t is more likely than not that . . . Reinke was responsible for the loss of electricity to the Simeus apartment." The hearing officer also noted that there was no evidence that (1) any other tenant had been given a notice to quit the premises after requesting a copy of the lease agreement, (2) Reinke had entered any other apartment to make repairs while the tenant was sleeping, or (3) Reinke had rolled up his car window when any other tenant was speaking to him. The hearing officer therefore determined that RGR and Reinke discriminated against Simeus based on his race or national origin. The hearing officer recommended the following order: that a civil penalty be imposed against Reinke in the amount of $1,000, that Reinke pay Simeus' moving costs in the amount of $100, that Reinke return Simeus' security deposit in the amount of $385, and that RGR file a satisfaction of the judgment against Simeus by Reinke or RGR for the eviction for unpaid rent or costs in the amount of $1,348.62.

On January 30, 2014, the Commission held a meeting at which it discussed, inter alia, the public hearing against RGR. And later on January 30, the Commission filed its "Final Order." The final order largely adopted the hearing officer's findings of fact, and set forth the following findings of fact:

     1. The property at issue in this case is located at 1315 D Street, in Lincoln, Nebraska. Respondent, RGR . . .

owns the subject property, and Respondent . . . Reinke is the sole owner of RGR . . . .

2. The Complainant . . . Simeus, is a black individual of Haitian descent. Respondent denies having knowledge of the Complainant's national origin. Respondent Reinke testified about the nationality or race of his other tenants, and testified that he believed Complainant Simeus had a speech impediment and not an accent. Based on the record of the hearing, Complainant Simeus speaks English with a Haitian accent.

3. On June 1, 2013, Complainant Simeus moved into 1315 D Street, #6. The monthly rent was $385.

4. On June 5, 2013, Complainant Simeus asked Respondent Reinke for a copy of the lease agreement. Respondent did not provide the lease agreement to Complainant Simeus, and told Complainant Simeus that he was not going to provide him a copy.

5. Numerous attempts were made by Complainant Simeus to contact Respondent Reinke relating to needed repairs in the subject property.

6. After this time, Respondent Reinke stopped communicating with Complainant Simeus, refused to return his phone calls, and rolled up the window of his vehicle when Complainant Simeus tried to speak with him.

7. On June 6, 2013, Respondent Reinke issued a 14 day notice to Complainant Simeus citing his use of candles/ smoking, disturbing the peace, argumentative or threatening tenants, and public intoxication. This was issued within six days of the Complainant moving into the subject property citing violations of a lease agreement which was never provided to Complainant Simeus.

8. On June 7, 2013, the Lincoln Police Department was called to 1315 D Street, #6 and an officer was there for seven minutes.

9. On June 12, 2013, Complainant Simeus filed the instant case with the . . . Commission . . . and the

Department of Housing & Urban Development alleging discrimination in housing in violation of the Lincoln Municipal Code and the Federal Fair Housing Act as amended.

10. On or about June 17, 2013, Complainant Simeus contacted the Lincoln Building & Safety Department regarding perceived violations of the housing code at 1315 D Street, #6. An inspection was done that day and a code violation was found.

11. On June 26, 2013, the electricity stopped working in 1315 D Street, #6. This unit was the only unit affected. The electrical service in the building is located behind a locked door. The City Inspector found that the issue stemmed from a breaker box in this locked room.

12. On June 27, 2013, Respondent Reinke entered the rented premises to make requested repairs while Complainant Simeus was sleeping. Respondent Reinke did not give advance notice to Complainant Simeus that he would enter the apartment and make the repairs. He made the repairs while Complainant Simeus was sleeping, twenty[-]seven days after Complainant Simeus began requesting the repairs be completed.

13. On July 9, 2013, Respondent Reinke served on Complainant Simeus a 3 day notice of breach of lease agreement seeking $465.

14. A signed lease agreement was not produced during the hearing, and Respondent Reinke provided no explanation as to why it was not produced except to say that another attorney had possession of it.

15. Complainant Simeus moved from 1315 D Street, #6, after refusing to pay his rent for the month of July 2013.

16. No evidence exists to show that any tenant, other than Complainant Simeus, was given a notice to quit the premises shortly after requesting a copy of the lease agreement.

17. No evidence exists to show that Respondent Reinke entered another tenant's apartment when the tenant was asleep or under the influence of medication.

18. No evidence exists that Respondent Reinke rolled up the car window when any other tenant was speaking to him.

19. Evidence does exist to show that a tenant of Ethiopian descent, residing in #5 of the subject property, has a large hole in the ceiling of his bathroom that has existed for a minimum of several months.

20. Evidence exists to show that the tenant residing in apartment #5 has requested Respondent Reinke [to] fix this hole on at least one occasion. As of the date of the public hearing, the hole had not been repaired.

In the final order, the Commission ordered: a civil penalty against RGR and Reinke in the amount of $2,000, that RGR and Reinke pay Simeus' moving costs in the amount of $100, that RGR and Reinke return Simeus' security deposit in the amount of $385, that RGR file a satisfaction of the judgment against Simeus for the eviction for unpaid rent or costs in the amount of $1,348.62 in separate case No. CI 13-8406, and that RGR and Reinke pay Simeus pain and suffering in the amount of $3,500.

On February 7, 2014, RGR filed a motion for new trial or reconsideration in which it challenged the findings and the award against RGR. On February 27, the Commission filed an amended final order, which amended the original final order by deleting the requirement that Reinke file a satisfaction of judgment in case No. CI 13-8406; all other portions of the original final order remained unchanged.

RGR appealed from the amended final order to the district court. On December 23, 2014, the district court filed an order in which it affirmed the decision of the Commission. The district court stated that after reviewing the record and considering the parties' oral arguments and briefs, it generally gave deference to the credibility determinations of the hearing

officer and the Commission and affirmed the Commission's amended final order.

RGR appeals.

## ASSIGNMENTS OF ERROR

RGR claims that the district court erred in numerous respects, including finding that the evidence was sufficient to prove that RGR discriminated against Simeus based on his race and national origin, relying on hearsay evidence, and awarding inappropriate damages. Because our analysis of RGR's first assignment of error regarding the sufficiency of evidence is dispositive, we do not reach RGR's remaining assignments of error. See *Cain v. Custer Cty. Bd. of Equal.*, 291 Neb. 730, 750, 868 N.W.2d 334, 348 (2015) (stating that "[a]n appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it").

## STANDARDS OF REVIEW

[1,2] According to § 11.02.070(j) of the Lincoln Municipal Code, regarding equal opportunity administration, an appeal from an order of the Commission shall be taken to the district court as provided in Neb. Rev. Stat. § 15-1201 et seq. (Reissue 2012). In district court, the case shall be heard as in equity without a jury. See § 15-1205. An appeal of a case heard in district court under § 15-1201 et seq. to the appellate court is to be reviewed as in equity. See, *Whitehead Oil Co. v. City of Lincoln*, 245 Neb. 660, 515 N.W.2d 390 (1994); *American Stores v. Jordan*, 213 Neb. 213, 328 N.W.2d 756 (1982). On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court, provided that where credible evidence is in conflict in a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Rauscher v. City of Lincoln*, 269 Neb. 267, 691 N.W.2d 844 (2005)

(considering appeal in wage claim action filed in district court under § 15-1201 et seq.).

## ANALYSIS

*Clarifying Standards of Review.*

As an initial matter, we note that there appears to be some inconsistency in the appellate briefs regarding the relevant standards of review applicable to an appeal of an order of the Commission. Accordingly, we clarify the correct standards of review.

The standards of review relevant to this case can be found by following the legislative scheme. We begin with § 11.02.070(j) of the Lincoln Municipal Code pertaining to equal opportunity administration, which provides that "orders of the Commission may be appealed to the District Court of Lancaster County as provided by Neb. Rev. Stat. § 15-1201, et seq." Section 15-1201 et seq. generally refers to appeals of orders and decisions from various entities of a city of the primary class. Lincoln is a city of the primary class.

Section 15-1205 provides:

> The district court shall hear the appeal as in equity and without a jury and determine anew all questions raised before the city. The court may reverse or affirm, wholly or partly, or may modify the order or decision brought up for review. Either party may appeal from the decision of the district court to the Court of Appeals.

[3,4] We have previously stated that an appeal filed in district court pursuant to § 15-1201 et seq. from an order or decision of a human rights commission of a city of the primary class is to be heard as in equity, and upon appeal to this court, it is the duty of this court to try issues of fact de novo upon the record and to reach an independent conclusion thereon without reference to the findings of the district court. *American Stores, supra*. When reviewing an appeal de novo on the record, we have recently stated that an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions on the matters at issue. See

*In re Claims Against Pierce Elevator*, 291 Neb. 798, 868 N.W.2d 781 (2015). See, similarly, *Rauscher, supra*.

Contrary to the standards of review recited immediately above, it appears that the confusion regarding the proper standard of review to be applied by this court in this case results from the citation to decisions which involved appeals of cases which had been filed in district court as petitions in error generally under Neb. Rev. Stat. § 25-1903 (Reissue 2008). In contrast to the de novo on the record standard of review applicable in this case stemming from the filing of this case under § 15-1201 et seq., the standard of review by the appellate courts reviewing a ruling by the district court on a petition in error is a review of the matter to determine whether the agency acted within its jurisdiction and whether sufficient, relevant evidence supports the decision of the agency. See *Fleming v. Civil Serv. Comm. of Douglas Cty.*, 280 Neb. 1014, 792 N.W.2d 871 (2011). Such is not the standard of review applicable here.

As ably explained in *Jackson v. Board of Equal. of Omaha*, 10 Neb. App. 330, 630 N.W.2d 680 (2001), where possible, the relevant standard of review should be identified in statutes and applied. Thus, in *Jackson*, the Nebraska Court of Appeals observed that given the statutory framework, the standard of review applicable to an appeal of a city council's special assessment to the district court differed according to whether the city is of the "'metropolitan class'" or "'primary class'"; the former proceeds to a petition in error via statutes commencing with Neb. Rev. Stat. § 14-548 (Reissue 1997) and is reviewed solely on the record before the original tribunal, whereas the latter proceeds via § 15-1205 and is "'heard in the district court as in equity and without a jury.'" 10 Neb. App. at 334, 335, 630 N.W.2d at 684.

In the present case, the language of § 11.02.070(j) of the Lincoln Municipal Code put us on the path to identifying the controlling standard of review. Section 11.02.070(j) specifically provides that "orders of the Commission may be

appealed to the District Court of Lancaster County as provided by Neb. Rev. Stat. § 15-1201, et seq." Section 15-1205 provides that "[t]he district court shall hear the appeal as in equity and without a jury and determine anew all questions raised before the city." Thereafter, this case must be reviewed by this court as an equity action de novo on the record. It is on this basis that we have reappraised the evidence and, as discussed below, reach a different outcome than the lower tribunals.

*Merits of the Case and Applicable Framework.*

In its first assignment of error, RGR contends that the evidence presented at the public hearing, which served as the trial in this matter, was insufficient to prove that RGR intentionally discriminated against Simeus on the basis of Simeus' race and national origin. We agree with RGR. Because our analysis of RGR's first assignment of error is dispositive, we do not reach RGR's remaining assignments of error. See *Cain v. Custer Cty. Bd. of Equal.*, 291 Neb. 730, 868 N.W.2d 334 (2015).

This case was brought under § 11.06.020 of the Lincoln Municipal Code, which provides that regarding housing "it shall be unlawful to . . . (b) Discriminate against any person in the terms, conditions, privileges of sale or rental of a dwelling, or in the provision of service or facilities in connection therewith, because of race, color, religion, sex, disability, national origin, familial status, handicap, ancestry, or marital status." Section 11.06.020(b) of the Lincoln Municipal Code was modeled after 42 U.S.C. § 3604(b) of the federal Fair Housing Act. Section 3604 of the federal Fair Housing Act provides that "it shall be unlawful . . . (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." We note that Neb. Rev. Stat. § 20-318(2) (Reissue 2012) of the Nebraska

Fair Housing Act is also modeled after § 3604(b) of the federal Fair Housing Act. Therefore, because § 11.06.020(b) of the Lincoln Municipal Code is patterned after § 3604(b) of the federal Fair Housing Act, as is § 20-318(2) of the Nebraska Fair Housing Act, we look to federal decisions regarding the federal Fair Housing Act and Nebraska decisions regarding the Nebraska Fair Housing Act for guidance. See, *Ventura v. State*, 246 Neb. 116, 517 N.W.2d 368 (1994); *Zalkins Peerless Co. v. Nebraska Equal Opp. Comm.*, 217 Neb. 289, 348 N.W.2d 846 (1984).

[5,6] In a housing discrimination case, a court evaluates the evidence under the three-part burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See, *Ventura, supra* (applying *McDonnell Douglas Corp.* three-part burden-shifting framework in case involving housing discrimination); *Osborn v. Kellogg*, 4 Neb. App. 594, 547 N.W.2d 504 (1996) (applying *McDonnell Douglas Corp.* three-part burden-shifting framework in case involving housing discrimination). Following trial, under the *McDonnell Douglas Corp.* framework, (1) the plaintiff has the burden of establishing a prima facie case of discrimination; (2) if the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action; and (3) if the defendant successfully articulates a legitimate, nondiscriminatory reason for its action, to succeed, the plaintiff must prove by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but was instead a pretext for discrimination and that discrimination was the real reason. See *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

[7] Regarding the burden of persuasion, the U.S. Supreme Court stated that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas*

*Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) (applying *McDonnell Douglas Corp.* three-part burden-shifting framework in case involving employment discrimination). Thus, we have stated that the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Ventura, supra*. See, also, *O'Brien v. Bellevue Public Schools*, 289 Neb. 637, 856 N.W.2d 731 (2014) (applying *McDonnell Douglas Corp.* three-part burden-shifting framework in case involving wrongful termination from employment). The "ultimate question [is] discrimination *vel non*." *U.S. Postal Service Bd. of Govs. v. Aikens*, 460 U.S. 711, 714, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983).

*The Commission's Prima Facie Case.*

Under the *McDonnell Douglas Corp.* three-part framework, the Commission, on behalf of Simeus, must first establish a prima facie case of housing discrimination. We determine that the Commission's evidence demonstrated a prima facie case.

The applicable section of the Lincoln Municipal Code describing what acts are unlawful regarding housing is § 11.06.020, entitled "Unlawful Acts Enumerated." As stated above, § 11.06.020 provides that "it shall be unlawful to . . . (b) Discriminate against any person in the terms, conditions, privileges of sale or rental of a dwelling, or in the provision of service or facilities in connection therewith, because of race, color, religion, sex, disability, national origin, familial status, handicap, ancestry, or marital status." Therefore, under § 11.06.020(b) of the Lincoln Municipal Code, in order to establish a prima facie case of housing discrimination, the Commission must demonstrate by a preponderance of evidence that (1) Simeus is a member of one of the protected classes enumerated in § 11.06.020(b); (2) Simeus was discriminated against in the terms, conditions, privileges of sale or rental of a dwelling, or in the provision of service or facilities in

connection therewith, and (3) the discrimination was because of his status as a member of one of the enumerated protected classes. The Commission always retained the ultimate burden of persuading the trier of fact that RGR intentionally discriminated against Simeus. See, *Ventura v. State*, 246 Neb. 116, 517 N.W.2d 368 (1994); *Osborn v. Kellogg*, 4 Neb. App. 594, 547 N.W.2d 504 (1996).

With respect to the first element, the Commission demonstrated that Simeus is a member of two of the protected classes listed in § 11.06.020(b): race and national origin. The parties do not dispute that Simeus is black. Because the evidence presented at the hearing focused on Simeus' national origin, we focus on that protected class. Simeus testified at the hearing that he is from Haiti. The Commission met the first element of the prima facie case.

With respect to the second element, the Commission produced evidence at the hearing which showed that RGR provided inadequate service in connection with Simeus' rental of the apartment. The record shows that Reinke, the sole owner of RGR, refused to provide Simeus with a copy of the lease agreement, despite Simeus' requests for a copy. The record also shows that Reinke was slow in responding to Simeus' requests for repairs to his apartment. Soon after Simeus began his lease on June 1, 2013, Simeus noted that his apartment was in need of repairs. There was a hole in his bedroom wall. There were broken items, including a shower faucet, kitchen cabinets, and a stove with only one functioning burner. Simeus called Reinke regarding the repairs, but Reinke did not return those calls. On or about June 17, Simeus contacted Lincoln's Building and Safety Department regarding the needed repairs. A housing inspector determined that the leaking faucet constituted a code violation, and a letter was sent to RGR stating that the violation must be repaired by July 3.

The evidence shows that on June 27, 2013, Reinke entered Simeus' apartment to make the repairs. He did not provide Simeus with notice. The evidence further shows that Reinke

completed the repairs while Simeus was asleep. In an interview with Lemke, Reinke acknowledged that he completed the repairs while Simeus "was 'not alert.'"

The record also shows that on June 26, 2013, the electricity stopped working in Simeus' apartment and that Simeus' apartment was the only one in which the electricity was affected. A housing inspector from the Building and Safety Department determined that the issue was with the main breaker box located in a locked closet in the hallway outside of Simeus' apartment.

Based on the evidence regarding Reinke's refusal to provide Simeus a copy of the lease, Reinke's delay in responding to Simeus' request for repairs (at least one of which was a code violation), the fact that Reinke entered Simeus' apartment without notice and completed the repairs while Simeus was asleep, and the electricity outage limited to Simeus' apartment, the Commission demonstrated that RGR provided inadequate service to Simeus in connection with his rental of the apartment and established the second element of the prima facie case.

With respect to the third element of the prima facie case, the Commission's evidence adequately showed that RGR's poor provision of service could be viewed as resulting from Simeus' status as a member of a protected class, namely his national origin. Specifically, Simeus testified that he is from Haiti. Simeus further testified at the hearing that on or about June 5, 2013, he approached Reinke, who was sitting in his vehicle outside the apartment building, with the intention of speaking with him. According to Simeus' testimony and as contained in the housing discrimination complaint, instead of talking to Simeus, Reinke rolled up his window and said, "'That's why I don't want to deal with you foreigners . . . .'" There was additional evidence that RGR also failed to make timely repairs to an apartment where a man of Ethiopian descent lived. For purposes of its prima facie case regarding the third element, the Commission adequately showed that the

poor provision of services to Simeus by RGR could be the result of Simeus' national origin. Because the Commission, on behalf of Simeus, demonstrated these three elements, the Commission met its initial burden of establishing a prima facie case of discrimination.

*RGR's Legitimate, Nondiscriminatory Reasons.*

Because the Commission established a prima facie case of discrimination, under the three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), the burden shifted to RGR to articulate some legitimate, nondiscriminatory reasons for its action. We determine that by its evidence, RGR successfully articulated legitimate, nondiscriminatory reasons for its actions.

[8] The defendant's responsibility to produce proof of a nondiscriminatory, legitimate justification for its action is not an onerous task. *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917 (8th Cir. 2014) (stating proposition in case involving retaliatory discharge). It is a burden of production, not of persuasion. *Riesen v. Irwin Indus. Tool Co.*, 272 Neb. 41, 717 N.W.2d 907 (2006) (stating proposition in case involving retaliatory discharge). In order to meet the requisite burden, the defendant need only explain what has been done or produce evidence of a legitimate, nondiscriminatory reason for the action. See, *O'Brien v. Bellevue Public Schools*, 289 Neb. 637, 85 N.W.2d 731 (2014); *Riesen, supra*. Furthermore, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). This is so because the burden-of-production determination necessarily precedes the credibility-assessment stage. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). A failure of production by the defendant occurs when the defendant has failed to introduce evidence which, taken as true, would permit the conclusion

that there was a nondiscriminatory reason for the adverse action. See *id*. But a failure of production at this stage is not because the proffered explanation is "'unworthy of credence.'" 509 U.S. at 517.

At the hearing, Reinke testified that he was aware that Simeus was black when he rented the apartment to him, but he stated that he was unaware that Simeus was foreign born until the complaint was filed in this case. Reinke stated that he did not think Simeus spoke with an accent, which would have indicated to him that Simeus was foreign born, but instead, Reinke testified that he believed that Simeus had a speech impediment.

Reinke testified that the reason he did not provide Simeus with a copy of the signed lease agreement was not based on Simeus' race or national origin. Reinke stated that he did not provide Simeus with a copy of the signed lease agreement because his copy machine was broken, and accordingly, he could not make a copy of the lease for Simeus or any other tenant. Reinke testified that he offered to scan the signed lease agreement and e-mail the copy of it to Simeus, but that he did not do so because Simeus never provided him with an e-mail address.

Reinke testified that the reason he had delayed in making Simeus' requested repairs was not based on Simeus' race or national origin. Reinke explained that he delayed in completing Simeus' repairs because he had a large number of requested repairs that were needed in the apartments he managed, and he had to prioritize how to complete the repairs. Reinke testified that he prioritizes the maintenance requests based on the emergent nature of the repairs needed. Reinke also testified that he was unaware of the leaking faucet in Simeus' apartment until he received the letter from the housing inspector, and accordingly, he was unaware that the faucet needed repair before then.

At the hearing, RGR offered, and the hearing officer received, exhibit 30, which was created for purposes of this

case and consisted of a list of tenants who had outstanding maintenance requests for repairs. Reinke testified that sometimes the maintenance requests take months to complete. Reinke testified that many of the tenants listed on exhibit 30 were Caucasian, and the Commission agreed at the hearing to stipulate that, according to Reinke's opinion, 75 percent of the tenants listed on exhibit 30 were "white." Reinke further stated that he does not answer all of his tenants' calls regarding requests for repairs because he receives such calls "[h]ourly" and he does not "have the physical capacity to sit on the phone for every phone call." RGR also offered, and the hearing officer received, exhibit 34, which was a list created by Reinke for purposes of this case of 24 tenants that RGR rented to who Reinke believed were foreign born.

Reinke testified that the lease agreements he has with his tenants allows him to go into a tenant's apartment without notice in the event the tenant makes a maintenance request for repairs. He further testified that in order to make repairs, he has entered other tenants' apartments, including Caucasian tenants, when the tenants were sleeping. Therefore, Reinke contends that the reason he entered Simeus' apartment without notice and completed the requested repairs while Simeus was asleep was because that is how he generally conducts his business, and not because of Simeus' race or national origin.

Regarding the electricity not operating in Simeus' apartment on June 26, 2013, Reinke testified that on that day, there were maintenance people in Simeus' apartment building, and that Reinke had given them the key to the electrical cabinet in case they needed access to it. Reinke stated that he was not aware that the housing inspector was in the building that day to inspect the electricity issue in Simeus' apartment.

Based on the foregoing reasons that RGR provided for its actions and its evidence contained in the record, we determine that RGR met its burden of production and articulated legitimate, nondiscriminatory reasons for its actions. In this regard, we repeat that the defendant need not persuade the court it was

actually motivated by the proffered reasons. See *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

### No Establishment of Pretext or Real Reason Was Intentional Discrimination.

Where the defendant succeeds, as did RGR in this case, in carrying its burden of production, then the *McDonnell Douglas Corp.* framework's presumptions are no longer relevant. See *St. Mary's Honor Center, supra*. Regarding the defendant's articulated explanations and reasons, the U.S. Supreme Court in *St. Mary's Honor Center* has stated that "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." 509 U.S. at 515 (emphasis in original). Therefore, the trier of fact proceeds to the third stage in which it is to decide the ultimate question: whether the plaintiff has proved that the defendant intentionally discriminated against him or her because of race or national origin. See *id*. As applied in this case, to succeed on its claim of intentional discrimination, the Commission was required to establish by a preponderance of the evidence that the legitimate reasons offered by RGR were not its true reasons, but pretexts for discrimination, and that Simeus was intentionally discriminated against. See, *St. Mary's Honor Center, supra*; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Following our de novo review of the record, we determine that the Commission did not establish by a preponderance of the evidence that RGR's proffered reasons were pretexts or that Simeus was the victim of intentional discrimination.

[9,10] The term "pretext" means pretext for discrimination. *Osborn v. Kellogg*, 4 Neb. App. 594, 547 N.W.2d 504 (1996). A defendant's reason for its action cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false and that discrimination was the real

reason. *Doe v. Board of Regents*, 287 Neb. 990, 846 N.W.2d 126 (2014) (applying *McDonnell Douglas Corp.* framework to case involving discrimination based on disability). See, also, *Osborn, supra*. The plaintiff must do more than merely discredit the defendant's explanation. We have stated that although strong evidence of a prima facie case of discrimination can also be considered to establish pretext, proof of pretext or actual discrimination requires more substantial evidence. *O'Brien v. Bellevue Public Schools*, 289 Neb. 637, 856 N.W.2d 731 (2014) (applying *McDonnell Douglas Corp.* framework to case involving retaliatory discharge from employment).

In support of its assertion that RGR's proffered reasons were a pretext, the Commission points to the fact that an Ethiopian man living in another of RGR's apartments had a hole in the ceiling of his apartment which was not repaired for "a minimum of several months." The Commission contends that this evidence relating to another foreign-born tenant supports its assertion that RGR's proffered reasons are a pretext and that RGR discriminates in completing repairs based on a tenant's national origin in general and did so as to Simeus in particular.

However, upon our de novo review of the record, the evidence shows that RGR is slow to complete repairs for many tenants and that most notably, its negative treatment is not limited to tenants who are foreign born. At the hearing, RGR offered exhibit 34, in which Reinke listed names of 24 tenants who he believed were foreign born. RGR also offered exhibit 30, in which Reinke listed the tenants who had outstanding maintenance requests for repairs to their apartments. The record demonstrates that while some tenants whose apartments were in need of repairs were foreign born, not all of the tenants were, and that the parties stipulated that approximately 75 percent of the tenants listed on exhibit 30 awaiting repairs were Caucasian. Reinke testified that he prioritizes the requested repairs based on the emergent nature

of the requests. Reinke testified that some of the repairs took months to complete. The fact that the Commission can point to evidence of delayed repairs for one other foreign-born tenant does not dispute or defeat RGR's assertion that it is generally slow to complete many of its tenants' requested repairs, including Caucasian and non-foreign-born tenants. The Commission did not show that RGR's explanation was a pretext for discrimination.

In a further attempt to establish that RGR's proffered reasons are pretexts, the Commission also points to the disputed statement of June 5, 2013. Simeus testified that on June 5, he approached Reinke while Reinke was in his car, and that instead of speaking with Simeus, Reinke rolled up his car window and told Simeus, "'That's why I don't want to deal with you foreigners . . . .'" Reinke testified that he never made this statement. He further testified that he rolled up his car window when Simeus approached him because Reinke was already having a conversation with someone on his cell phone and he wanted to complete that conversation.

We recognize that when reviewing an equity case de novo on the record where evidence is in dispute, we may give weight to the fact that the fact finder heard and observed the witnesses and accepted one version of the facts rather than another. See *Rauscher v. City of Lincoln*, 269 Neb. 267, 691 N.W.2d 844 (2005). But such deference is not limitless.

The parties acknowledge that there are credibility issues regarding both Simeus and Reinke. And it is clear from the record that Simeus considered Reinke to be a difficult landlord and that Reinke considered Simeus to be a problematic tenant. Nevertheless, we determine that the disputed statement, whether Reinke stated it or not, did not establish that RGR's proffered reasons for its treatment of Simeus were false or pretexts, or that discrimination was the real reason for its actions.

As outlined above, the record indicates that Reinke is slow to complete all tenants' requested repairs, he enters tenants'

apartments evidently with little or no notice to make repairs, and he sometimes completes the repairs while the tenants are sleeping. The record shows that Reinke's tardy method of making repairs, although negative, was not limited to foreign-born tenants.

We are required to analyze the third stage of the proceedings under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1993). Given the totality of the evidence contained in the record, and applying our correct equity standard of review of de novo upon the record, we determine that the Commission did not prove that RGR's proffered reasons were false, nor did the Commission prove that discrimination was RGR's real reason for its actions. Based on our determinations stated above, we conclude that the district court erred when it affirmed the final amended order of the Commission, and we enter orders as indicated below.

## CONCLUSION

In this housing discrimination case, we determine that the district court erred when it affirmed the final amended order of the Commission, which had ruled in favor of the Commission and against RGR. We reverse the decision of the district court and remand the cause to the district court with directions to remand the matter to the Commission with directions that the Commission dismiss the charge brought by the Commission, on behalf of Simeus, against RGR.

REVERSED AND REMANDED WITH DIRECTIONS.

MCCORMACK and STACY, JJ., not participating.