Cindy Marshall, appellant, v.
EyeCare Specialties, P.C.
of Lincoln, appellee.
___ N.W.2d ___

Filed July 2, 2015.    No. S-14-696.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.
2. **Administrative Law: Evidence.** Admission of an administrative agency's findings is within the trial court's discretion.
3. **Summary Judgment.** Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.
4. **Summary Judgment: Appeal and Error.** In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.
5. **Summary Judgment: Proof.** A party makes a prima facie case that it is entitled to summary judgment by offering sufficient evidence that, assuming the evidence went uncontested at trial, would entitle the party to a favorable verdict.
6. **Summary Judgment: Evidence: Proof.** After the movant for summary judgment makes a prima facie case by producing enough evidence to demonstrate that the movant is entitled to judgment if the evidence was uncontroverted at trial, the burden to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law shifts to the party opposing the motion.

7. **Termination of Employment.** The general rule in Nebraska is that an employer, without incurring liability, may terminate the employment of an at-will employee at any time with or without reason, unless termination is constitutionally, statutorily, or contractually prohibited.

8. **Fair Employment Practices: Termination of Employment: Discrimination.** Neb. Rev. Stat. § 48-1104(1) (Reissue 2010) makes it unlawful for an employer to discharge or otherwise discriminate against an individual because of, among other things, the individual's disability.

9. **Fair Employment Practices: Words and Phrases.** For purposes of Neb. Rev. Stat. § 48-1104(1) (Reissue 2010), disability means, among other things, being regarded as having a physical or mental impairment.

10. **Discrimination: Proof.** An individual can show that he or she was regarded as having a physical or mental impairment if the individual establishes that he or she has been subjected to a prohibited action because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

11. **Evidence: Proof: Words and Phrases.** Direct evidence is that evidence which proves the fact in dispute directly without inference or presumption.

12. **Employer and Employee: Discrimination: Evidence: Proof.** In the context of an employment discrimination case, direct evidence is statements by a person with control over the employment decision sufficient to prove discrimination without inference or presumption which reflect a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee and are made by a person involved in the challenged decision.

13. **Discrimination: Evidence.** Evidence is not direct when the statement only suggests discrimination or is subject to more than one interpretation. Thus, stray remarks, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself are not direct evidence.

14. **Summary Judgment: Discrimination: Evidence.** When considering allegations of unlawful discrimination at the summary judgment stage, direct evidence is not the converse of circumstantial evidence.

15. **Discrimination: Evidence: Proof.** Direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. Thus, direct refers to the causal strength of the proof, not whether it is circumstantial evidence.

Appeal from the District Court for Lancaster County: John A. Colborn, Judge. Reversed and remanded for further proceedings.

Abby Osborn and Joy Shiffermiller, of Shiffermiller Law Office, P.C., L.L.O., for appellant.

Shawn D. Renner, Susan K. Sapp, and Tara A. Stingley, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellee.

Heavican, C.J., Connolly, McCormack, Miller-Lerman, and Cassel, JJ.

Cassel, J.

## INTRODUCTION

After Cindy Marshall's employer terminated her employment, Marshall sued—claiming unlawful discrimination based upon a perceived disability. The district court entered summary judgment in favor of the employer, and Marshall appeals. Because there is a genuine issue of material fact as to whether the employer terminated Marshall's employment on that basis, we reverse the summary judgment and remand the cause for further proceedings.

## BACKGROUND

### Parties

EyeCare Specialties, P.C. of Lincoln (EyeCare Specialties), provides optometric care to patients. In January 2007, it hired Marshall as a clinical technician. Prior to being employed by EyeCare Specialties, Marshall lost her nursing license and was diagnosed as being dependent on prescription medication. She completed treatment for her condition.

### Issues Regarding Marshall's Work Performance

In March 2007, Marshall received an above-average score on her employee performance evaluation. The 90-day evaluation noted that she was doing very well, that she was a

fast learner, and that she retained information well. In May, EyeCare Specialties scheduled her to attend "Marco school" to learn how to perform a specific eye examination. But several e-mails sent in May noted apprehensions about Marshall. One e-mail referenced "concerns that have been brought to us by other technicians regarding [Marshall's] staying on task, and her struggles at times with day[-]to[-]day clinic responsibilities." Another stated that Marshall "has a hard time staying focused on the flow" and that the coworker was concerned about Marshall's "hands getting very shakey [sic] more towards afternoon." An e-mail from the director of human resources at the time stated that others had reported Marshall seemed paranoid, had trouble staying focused, and "seems to not be present when they think she should be and they are not aware of where she is." And an e-mail from one of the doctors reported that a visual field test performed by Marshall was useless due to errors.

In June 2007, more concerns about Marshall were raised. One coworker's e-mail stated in part: "I saw [Marshall] taking medications at least four times. When I would see her and she would see me she acted very nervous and turned the other way to finish taking them and then would chug a cup of coffee." A different coworker stated that random drug testing needed to be implemented due to "an employee that always seems zoned out and alot [sic] of times doesn't seem able to perform her everyday duties." That e-mail went on to discuss Marshall's slowness in screening patients. Coworkers expressed frustration and unhappiness about the prospect of Marshall's receiving Marco training. Ultimately, Marshall was informed that she would not be going to "Marco school" due to concerns that she might not be ready. Also in June, Marshall reported to the director of human resources and the chief operating officer that she had told a coworker she lost her license as a nurse due to an addiction to prescription medication. The chief operating officer suggested that Marshall set her prescription bottle on the table when she needs to take medication so that staff can see what she is

taking. On June 28, Marshall received a corrective action form to address interpersonal issues with coworkers and quality of work issues.

In January 2008, Marshall became "Marco" certified. In January and February, she received verbal and written warnings for "abuse of time clock." In March, Marshall's supervisor reviewed with Marshall concerns about work performance, including slow workpace, poor attendance, inappropriate discussions with patients regarding test results, and poor performance in patient meetings. But in May, Marshall received a raise based on an above-average score on an "Epic Technician" performance evaluation. The following year, she received a smaller raise based on an average score on the same type of performance evaluation.

Marshall's subsequent annual evaluations had both positive and negative aspects. Her 2010 evaluation stated that she interacted well with patients, but that she needed to "be aware of schedule and how flow is moving," that she had a few issues with tardy arrivals, and that she could use improvement "in OPTOS images." Marshall's 2011 evaluation stated that she was "a good technician," but that her slow workpace continued to be a concern. The evaluation showed that she needed improvement in the following areas: "[p]erforms well, and uses good judgment, as tension and requirements increase"; "[c]onversations with . . . patients and staff are quiet so as not to disturb others in department"; and "[h]as complete confidence using . . . lensometers . . . ."

Marshall admitted that she had various conversations with Laura Houdesheldt, the director of human resources for EyeCare Specialties since April 2009, about performance issues such as productivity, speed, focus, and timing. On January 9, 2012, Houdesheldt gave Marshall a written warning and a corrective action plan for not doing Marshall's share of the work. One coworker told Houdesheldt that Marshall scratched her arms excessively. A doctor expressed concerns about Marshall's shaking while administering tests to patients' eyes. On January 26, Houdesheldt told Marshall that there

were concerns about sores on Marshall's arms and about Marshall's appearing anxious and acting paranoid. Marshall informed Houdesheldt that the "sores" were an inherited skin condition called senile purpura and that her tremors were also inherited. Houdesheldt observed red, raw-looking scratches and open, "weeping" sores on Marshall's arms. Marshall denied that her arms had open sores or "seeping" wounds. She testified in a deposition that she covered any open wounds with a bandage, but that her purpura "are like little bruises under the skin that are not open and weeping."

Marshall began using daily patient schedules to keep track of which technician handled each patient. These schedules would normally be shredded at the end of the day, but Marshall instead removed them from EyeCare Specialties' premises. The schedules show that over 13 particular days between February 2 and March 14, 2012, Marshall generally handled more patients than her coworkers.

Those working with Marshall reported no significant changes in Marshall's behavior or work performance in February 2012. On February 21, Houdesheldt gave Marshall a written warning and a corrective action plan. Houdesheldt informed Marshall that she had progressively become slower paced in her work and that she often left work for others to finish. According to Houdesheldt, Marshall then "abandoned" her shift without authorization, which is an offense that could result in the termination of employment. But Marshall testified in her deposition that she obtained permission to leave from her team leader.

On March 13, 2012, Houdesheldt presented Marshall with a second written warning. The corrective action plan stated that Marshall should continue with counseling and that termination of employment was likely if significant and consistent improvement was not seen within 3 weeks. Marshall provided Houdesheldt with a note from her doctor stating that she had "non-intention tremor" and a "rash" that was not contagious. Marshall was scheduled to work until 8 p.m., but she left at approximately 4:20 p.m. because she "felt sick to [her]

stomach." Marshall stated that she told Houdesheldt that she felt sick and was going to go home and that Houdesheldt said, "OK." But Houdesheldt stated that Marshall abandoned her shift without approval. The following day, EyeCare Specialties terminated Marshall's employment at the end of her shift. According to Houdesheldt, from October 2011 through March 2012, at least 13 individuals were disciplined and 5 individuals had their employment terminated for reasons similar to those for Marshall's termination of employment. Houdesheldt stated that Marshall consistently failed to meet performance expectations over her 5 years of employment.

### DISCRIMINATION ALLEGATIONS

Marshall filed a charge of discrimination with the Nebraska Equal Opportunity Commission (NEOC) and the federal Equal Employment Opportunity Commission. She felt that she was discriminated against based on a "[p]erceived disability." She explained: "They perceived I was unable to take eye pressures because of my tremors, and they perceived — I don't know what they perceived. I felt like they were discriminating against me because they were aware of my history." She further testified, "I believe that they did not want me there, that they believed that — maybe they perceived the tremors or my skin that bruises as using drugs, and so they used performance issues." But no one ever told Marshall that he or she thought the sores or tremors were due to drug use. Houdesheldt specifically testified in her deposition that she did not perceive Marshall as having a drug or alcohol problem. Houdesheldt stated that Marshall had no disability known to EyeCare Specialties, nor did Marshall ever identify any specific disability or activities that she was unable to perform.

In February 2013, Marshall filed a complaint against EyeCare Specialties, seeking damages for acts alleged to be in violation of the Nebraska Fair Employment Practice Act.[1]

---

[1] See Neb. Rev. Stat. § 48-1101 et seq. (Reissue 2010 & Cum. Supp. 2014).

She alleged that EyeCare Specialties perceived her as disabled when "it became known that she had entered into substance abuse treatment prior to her employment with [EyeCare Specialties] and because [Marshall] had at-rest hand tremors since she was a child." Marshall claimed that she was also perceived as disabled due to the purpura, which caused red marks on her skin. Marshall contended that she was required to wear adhesive bandages to cover her arms even though she covered her arms by a cuff as directed by her doctor and that she was required to lay out her medications where other employees could observe them.

EyeCare Specialties alleged in its answer that its actions were made in good faith compliance with applicable laws. It alleged that it terminated Marshall's employment due to poor performance, leaving work without authorization and without finishing her shift, insubordination, unprofessional conduct when being counseled about performance issues, and refusing to cover open wounds visible to patients.

### Summary Judgment

EyeCare Specialties moved for summary judgment. Following a hearing, the district court entered summary judgment in favor of EyeCare Specialties. The court rejected Marshall's claim that there was direct evidence of discrimination and her claim that the burden-shifting analysis under the framework of *McDonnell Douglas Corp. v. Green*[2] was unnecessary. The court next determined that a mixed-motive analysis under *Price Waterhouse v. Hopkins*[3] was inapplicable to Marshall's disability discrimination claim. The court recognized that *Price Waterhouse* involved a title VII case and that it did not address the Americans with Disabilities Act. The court stated that Marshall failed to meet her burden of

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[3] *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (superseded in part by federal Civil Rights Act of 1991).

showing that EyeCare Specialties would not have terminated her employment in the absence of her alleged perceived disability. The court concluded that Marshall failed to establish a prima facie case of discrimination based on a perceived disability. The court further reasoned that even if Marshall could establish a prima facie case of disability discrimination, EyeCare Specialties had established legitimate, nondiscriminatory reasons for terminating her employment. Finally, the court stated that Marshall had not presented any evidence creating a genuine issue of material fact that EyeCare Specialties' decision was a mere pretext for discrimination.

Marshall timely appealed, and we moved the case to our docket.[4]

## ASSIGNMENTS OF ERROR

Marshall assigns, consolidated and restated, that the district court erred in (1) relying on the NEOC's findings and (2) granting summary judgment in favor of EyeCare Specialties.

## STANDARD OF REVIEW

[1] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[5]

## ANALYSIS

### NEOC Findings

[2] Marshall argues that the district court impermissibly relied on the NEOC's findings in granting summary judgment. We disagree. Admission of an administrative agency's findings is within the trial court's discretion.[6] But even if this

---

[4] See Neb. Rev. Stat. § 24-1106(3) (Reissue 2008).

[5] *Johnson v. Nelson*, 290 Neb. 703, 861 N.W.2d 705 (2015).

[6] See *White v. Honeywell, Inc.*, 141 F.3d 1270 (8th Cir. 1998).

evidence was inadmissible, the court's analysis did not refer to or rely upon the findings in any manner. The order merely mentioned the findings as part of its summarization of the case's background. This assignment of error lacks merit.

### SUMMARY JUDGMENT

[3-6] The principles regarding summary judgment are well established. Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[7] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.[8] A party makes a prima facie case that it is entitled to summary judgment by offering sufficient evidence that, assuming the evidence went uncontested at trial, would entitle the party to a favorable verdict.[9] After the movant for summary judgment makes such a prima facie case, the burden to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law shifts to the party opposing the motion.[10]

The crux of Marshall's appeal is that the district court erred in entering summary judgment, particularly because it failed to view the evidence in the light most favorable to her and failed to find that a genuine issue of material fact existed as to whether she was fired due to a perceived disability. After giving Marshall the benefit of all reasonable inferences deducible from the evidence, we agree that summary judgment was not proper in this case.

---

[7] *Johnson v. Nelson, supra* note 5.

[8] *Hughes v. School Dist. of Aurora*, 290 Neb. 47, 858 N.W.2d 590 (2015).

[9] *Doe v. Board of Regents*, 287 Neb. 990, 846 N.W.2d 126 (2014).

[10] *Id.*

[7-10] Although EyeCare Specialties hired Marshall on an at-will basis, Nebraska law prohibits discrimination on the basis of perceived disability. The general rule in Nebraska is that an employer, without incurring liability, may terminate the employment of an at-will employee at any time with or without reason, unless termination is constitutionally, statutorily, or contractually prohibited.[11] But a Nebraska statute makes it unlawful for an employer to discharge or otherwise discriminate against an individual because of, among other things, the individual's disability.[12] For purposes of that statute, disability means, among other things, "being regarded as having [a physical or mental] impairment."[13] An individual can show that he or she was regarded as having such an impairment "'if the individual establishes that he or she has been subjected to [a prohibited action] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'"[14] The focus is on the impairment's effect upon the attitudes of others.[15]

In Marshall's complaint, she identified her perceived disabilities as her substance abuse treatment prior to employment with EyeCare Specialties, her hand tremors, and her purpura. A qualified individual with a disability includes an individual who has been rehabilitated successfully or who is erroneously regarded as engaging in the illegal use of drugs.[16]

Marshall claims that the burden-shifting analysis originating in *McDonnell Douglas Corp. v. Green*[17] does not apply in the circumstances before us. We agree. We have previously

---

[11] See *Riesen v. Irwin Indus. Tool Co.*, 272 Neb. 41, 717 N.W.2d 907 (2006).

[12] See § 48-1104(1).

[13] § 48-1102(9)(c).

[14] *Tramp v. Associated Underwriters, Inc.*, 768 F.3d 793, 805 (8th Cir. 2014).

[15] *Wooten v. Farmland Foods*, 58 F.3d 382 (8th Cir. 1995).

[16] § 48-1102(10)(c)(i) and (iii).

[17] *McDonnell Douglas Corp. v. Green, supra* note 2.

employed that analytical framework when considering claims of employment discrimination.[18] That framework is used when an employee does not put forward direct evidence of discrimination.[19] But Marshall argues that she presented direct evidence of discrimination. This argument rests upon the meaning of direct evidence in the employment discrimination context.

[11-13] Our jurisprudence has defined direct evidence both in a general sense and in this specific area of law. We have stated that direct evidence is that evidence which proves the fact in dispute directly without inference or presumption.[20] We have also quoted from a federal district court case stating that in the context of an employment discrimination case, direct evidence is statements "'by a person with control over the employment decision "sufficient to prove discrimination without inference or presumption"'" which "'reflect a "discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee"'" and are "'"made by a person involved in the challenged decision."'"[21] According to the federal case: "'Evidence is not direct when the statement only "suggests discrimination" or "is subject to more than one interpretation." . . . Thus, "stray remarks . . . statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" are not direct evidence.'"[22]

[14,15] Marshall directs us to an explanation of direct evidence from the U.S. Court of Appeals for the Eighth Circuit.

---

[18] See *Riesen v. Irwin Indus. Tool Co., supra* note 11.

[19] See *Fleming v. Civil Serv. Comm. of Douglas Cty.*, 280 Neb. 1014, 792 N.W.2d 871 (2011).

[20] See *Nebraska Legislature on behalf of State v. Hergert*, 271 Neb. 976, 720 N.W.2d 372 (2006).

[21] *Father Flanagan's Boys' Home v. Agnew*, 256 Neb. 394, 404, 590 N.W.2d 688, 695 (1999), quoting *Moore v. Alabama State University*, 980 F. Supp. 426 (M.D. Ala. 1997).

[22] *Id.* at 404-05, 590 N.W.2d at 695.

In that case, the court stated that when considering allegations of unlawful discrimination at the summary judgment stage, direct evidence is "not the converse of circumstantial evidence."[23] The Eighth Circuit elaborated:

[D]irect evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. . . . Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial. But if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext.[24]

The Eighth Circuit's analysis is consistent with our law, and we adopt its reasoning.

Viewing the evidence in the light most favorable to Marshall, we conclude that she has presented direct evidence that illegal discrimination led to the termination of her employment. Marshall asserted that Houdesheldt told her on January 26, 2012, that EyeCare Specialties' "'real concern is that you have sores on your arm, you appear to be anxious and you are acting paranoid.'" The second written warning stated in part:

[Marshall's] performance continues to be an issue. Her performance is very inconsistent, with periods of average performance followed by periods where her performance decreases significantly. [Marshall] continues

---

[23] See *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004).

[24] *Id.*

to spend 20 - 30+ minutes working with a patient, causing everyone on her team to be off schedule and causing patients to get upset about the amount of time being spent. [Marshall] continues to refuse to cover her sores with bandages, using the bottom cuffs of some children's legging as sleeve extenders instead. I have talked to [Marshall] about the appropriate way to create a barrier with bandages[,] but she has not done so. [Marshall] continues to be jittery and easily flustered.

Thus, Marshall's refusal to cover her "sores" was given as a reason for the warning. But Marshall presented evidence that the so-called sores were actually an inherited skin condition that was "like little bruises under the skin that are not open and weeping." Although Marshall covered any cuts or open wounds with bandages, she did not want to risk tearing her skin in order to cover her skin condition with bandages. Such evidence can be construed as direct evidence that EyeCare Specialties perceived Marshall to have a disability. The ultimate strength or persuasiveness of this evidence is not before us, and we express no opinion on that issue. At this stage, the only question is whether this evidence was sufficient to create a genuine issue of material fact as to whether EyeCare Specialties terminated her employment for that reason. We conclude that it was. Accordingly, summary judgment was not proper.

## CONCLUSION

The judgment of the district court granting EyeCare Specialties' motion for summary judgment and dismissing Marshall's complaint is reversed, and the cause is remanded to the district court for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

WRIGHT and STEPHAN, JJ., not participating.