Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/25/2016 09:05 AM CDT

Cindy Marshall, appellant, v.
EyeCare Specialties, P.C.
of Lincoln, appellee.
___ N.W.2d ___

Filed March 25, 2016.    No. S-14-696.

1. **Summary Judgment: Appeal and Error.** An appellate court affirms a
lower court's grant of summary judgment if the pleadings and admitted
evidence show that there is no genuine issue as to any material facts or
as to the ultimate inferences that may be drawn from the facts and that
the moving party is entitled to judgment as a matter of law.

2. ____: ____. In reviewing a summary judgment, an appellate court views
the evidence in the light most favorable to the party against whom the
judgment was granted, and gives that party the benefit of all reasonable
inferences deducible from the evidence.

3. **Trial: Evidence: Waiver.** If the party against whom evidence is offered
fails to object to its introduction, that party waives whatever objection
he or she might have had.

4. **Fair Employment Practices: Employer and Employee: Proof.** To
show that an employer regarded an employee as disabled under Neb.
Rev. Stat. § 48-1102(9)(c) (Reissue 2010), the employee must demon-
strate either that (1) despite having no impairment at all, the employer
mistakenly believed that the employee had an impairment that substan-
tially limited one or more major life activities, or (2) the employee had a
nonlimiting impairment that the employer mistakenly believed substan-
tially limited one or more major life activities.

5. **Fair Employment Practices: Discrimination: Proof.** An employee
asserting a claim of disability discrimination under the Nebraska Fair
Employment Practice Act has two ways to show a genuine issue of
material fact for summary judgment purposes: (1) producing direct
evidence of discrimination or (2) raising an inference of discrimination
under the tripartite burden-shifting framework of *McDonnell Douglas
Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

6. **Fair Employment Practices: Discrimination: Evidence: Words and Phrases.** In the context of a disability discrimination claim under the Nebraska Fair Employment Practice Act, direct evidence consists of statements by a person with control over the employment decision sufficient to prove discrimination without inference or presumption.

7. **Fair Employment Practices: Discrimination: Proof.** To raise an inference of discrimination under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), tripartite burden-shifting framework, (1) the plaintiff has the burden of proving a prima facie case of discrimination; (2) if the plaintiff proves a prima facie case, the burden shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action; and (3) if the employer articulates a nondiscriminatory reason for its action, the employee maintains the burden to persuade the fact finder that the stated reason was pretextual.

8. **Fair Employment Practices: Words and Phrases.** Under Neb. Rev. Stat. § 48-1102(9) (Reissue 2010), "major life activities" are those activities that are of central importance to daily life.

9. **Fair Employment Practices: Proof.** Under Neb. Rev. Stat. § 48-1102(9) (Reissue 2010), to be substantially limited in the major life activity of working, the plaintiff must show that he or she was significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.

10. **Fair Employment Practices: Words and Phrases.** Drug addiction is an impairment under Neb. Rev. Stat. § 48-1102(9) (Reissue 2010), but it is not a disability unless it substantially limits a major life activity or is perceived by the employer to substantially limit a major life activity.

11. **Fair Employment Practices: Discrimination: Proof.** To establish a prima facie case of disability discrimination under the Nebraska Fair Employment Practice Act, plaintiffs must show that (1) they were disabled, (2) they could perform the essential functions of the position with or without reasonable accommodation, and (3) their employer subjected them to an adverse employment action because of their disability.

12. **Fair Employment Practices: Words and Phrases.** Concentrating, thinking, and communicating are major life activities under Neb. Rev. Stat. § 48-1102(9) (Reissue 2010).

Appeal from the District Court for Lancaster County: John A. Colborn, Judge. On motion for rehearing, reargument granted. See 291 Neb. 264, 865 N.W.2d 343 (2015), for

original opinion. Original opinion withdrawn. Reversed and remanded for further proceedings.

Abby Osborn and Joy Shiffermiller, of Shiffermiller Law Office, P.C., L.L.O., for appellant.

Shawn D. Renner, Susan K. Sapp, and Tara A. Stingley, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellee.

HEAVICAN, C.J., CONNOLLY, MILLER-LERMAN, and CASSEL, JJ., and IRWIN, INBODY, and PIRTLE, Judges.

CONNOLLY, J.

## I. SUMMARY

This case is before us on a motion for rehearing filed by EyeCare Specialties, P.C. of Lincoln (EyeCare Specialties). EyeCare Specialties employed Cindy Marshall as an optical technician from 2007 until it terminated her employment in 2012. Marshall sued EyeCare Specialties, alleging that it discriminated against her because it regarded her as disabled. The district court sustained EyeCare Specialties' motion for summary judgment, and Marshall appealed.

We filed an opinion deciding the appeal on July 2, 2015,[1] but we later sustained EyeCare Specialties' motion for rehearing. We now withdraw our former opinion. Marshall created a dispute of material fact concerning whether EyeCare Specialties discriminated against her because of her skin condition and tremors, which EyeCare Specialties perceived to substantially limit her ability to work. She did not create a fact question concerning whether EyeCare Specialties discriminated against her because of a perceived disability related to her past prescription drug abuse. We therefore reverse, and remand for further proceedings.

---

[1] *Marshall v. EyeCare Specialties*, 291 Neb. 264, 865 N.W.2d 343 (2015).

## II. BACKGROUND

In January 2007, EyeCare Specialties hired Marshall as an optical technician. Marshall previously worked as a registered nurse but "lost [her] nursing license" because of prescription drug abuse. Marshall said that she successfully completed treatment and did not abuse prescription drugs while she worked for EyeCare Specialties. She told her coworkers about her past drug abuse because they asked why she no longer worked as a nurse.

### 1. EMPLOYMENT ACTIONS IN 2007

In Marshall's first performance evaluation in March 2007, her scores were excellent or above average in every category except one. But she quickly became the subject of complaints from coworkers. In May 2007, a coworker said that Marshall had "a hard time staying focused on the flow" and got "very shakey [sic] more towards afternoon." Marshall told the coworker she was taking over-the-counter diet pills, which the coworker speculated might be causing Marshall's shakiness. In June, another coworker saw Marshall furtively "taking medications" at work. Yet another coworker said that "random drug testing NEEDS to be implemented." Marshall received a corrective action in June, signed by her "Team Leader" and the "Administration," stating that she needed to improve her "[i]nterpersonal issues with coworkers" and "[q]uality of work . . . ."

Marshall told EyeCare Specialties' administrators that she took "diet pills," in addition to medication to control her blood pressure and headaches. She later admitted that the diet pills might have worsened her "tremors." The administrators suggested that Marshall allay her coworkers' suspicion by setting her pill bottles on the table where others could see them.

### 2. EMPLOYMENT ACTIONS FROM 2008 THROUGH 2011

The record suggests that Marshall's next 4 years at EyeCare Specialties were relatively quiet. Her May 2008 performance

evaluation scored her as excellent or above average in all nine categories, including quality and productivity. The evaluation noted, though, that Marshall "[s]ometimes gets nervous with multitasking" and needed to "work on steady flow and not getting flustered."

In Marshall's March 2009 performance evaluation, her scores were excellent or above average in eight categories and satisfactory in one. The evaluation urged Marshall to not "spend too much time with challenging cases." In Marshall's June 2010 evaluation, which used a different rubric than the prior evaluations, the mean of her performance ratings was "Meets Requirements." The evaluation stated that Marshall "has had a few issues with tardy arrivals" but was improving.

Marshall received a slightly better rating in her March 2011 evaluation. The optometrists' comments were generally positive, although they noted that Marshall occasionally took too much time with a "tough patient" or a "difficult refraction." In April, the clinic coordinator expressed concerns about Marshall's inefficiency, tension with coworkers, and "attitude problem." An optometrist replied that Marshall was "very nervous and not good at multitasking."

### 3. EMPLOYMENT ACTIONS IN 2012

In 2012, Marshall's employment situation turned for the worse. On January 9, a coworker approached Laura Houdesheldt, EyeCare Specialties' human resources director, and said that Marshall was "very slow and getting slower." The coworker said that Marshall was "nervous," "confused," "'itching,'" and "shaking," and was taking what looked like diet pills.

Houdesheldt had a discussion with Marshall on January 9, 2012, culminating in a documented "verbal" warning. The corrective action plan stated that Marshall was "not doing her fair share."

Later, on January 24, 2012, Marshall and Houdesheldt had another talk about Marshall's performance. During their conversation, Houdesheldt observed "red, raw-looking scratches

on [Marshall's] right arm" and "some open sores that appeared to be wet." Houdesheldt said that Marshall's hands were "shaking quite a bit."

After her conversation with Marshall, Houdesheldt spoke to several of Marshall's coworkers. One coworker said she was "worried that [Marshall] was taking diet pills at work" and that Marshall's paranoia and confusion were increasing. The coworker reported that Marshall had told previous coworkers she had a "history of substance abuse." Houdesheldt later testified that she did not "perceive [Marshall] as having a drug or alcohol problem."

On January 26, 2012, Houdesheldt spoke with an optometrist who was concerned about Marshall's "inconsistent pace." The optometrist was also worried that Marshall jeopardized the patients' safety because she shook while administering tests and had "open wounds."

Houdesheldt met again with Marshall. Marshall said that the apparent sores were "beneath her skin," but Houdesheldt "observed some of the sores to be wet." Houdesheldt explained that EyeCare Specialties viewed Marshall's shaking and sores as workplace hazards:

> Marshall's use of specialized tools in close proximity to patients' eyes while suffering from hand tremors could pose [a risk of] injury to patients and cause discomfort and alarm to patients during testing procedures. Similarly, . . . Marshall's open weeping wounds on her arms could have exposed patients to . . . Marshall's bodily fluids or possible bacteria, or could have exposed . . . Marshall to infectious material from patients' eyes.

Houdesheldt offered to procure a "large bandage" but Marshall declined. Houdesheldt also discussed Marshall's "marked decrease in the quantity of her work." But, according to Marshall, Houdesheldt said that Marshall's failure to do her "fair share" was "'not our real concern.'"

Marshall began to cover her arms after the January 26, 2012, meeting with Houdesheldt, although she denied having "open,

weeping, wet wounds." Marshall said she had "very thin skin that bruises easy." Bandages would tear her skin, so she used "leggings" made from children's clothing to cover her arms. Marshall said that Houdesheldt referred to the leggings as a "clever idea."

In February 2012, Marshall and Houdesheldt had another discussion that climaxed in a written warning. Houdesheldt again pressed Marshall to "cover[] her open wounds" with bandages. The corrective action plan stated that Marshall had "progressively become slower paced in her work" and that her "shaking and her uncovered sores are a concern as she performs tests that bring her in close proximity to patient's [sic] eyes." Marshall left work after her conversation with Houdesheldt. She thought she had permission to leave early, but Houdesheldt disagreed.

On March 13, 2012, an optometrist told Houdesheldt that "Marshall's work pace was very inconsistent and slow, that . . . Marshall was confused from time to time and had trouble verbalizing her thoughts, and that . . . Marshall's failure to address and improve her performance issues was problematic." Houdesheldt had another talk with Marshall.

At her March 13, 2012, meeting with Houdesheldt, Marshall produced a note from her physician dated January 27, 2012, which said that Marshall had a "non-intention tremor & it does not affect work performance." The doctor's note further said that Marshall's "rash is not contagious." The note did not alleviate Houdesheldt's concerns because she did not think Marshall's skin condition was a "rash."

The March 13, 2012, corrective action plan stated that Marshall was "very inconsistent, with periods of average performance followed by periods where her performance decreases significantly." Furthermore, Marshall "continue[d] to refuse to cover her sores with bandages, using the bottom cuffs of some children's legging as sleeve extenders instead." She also "continue[d] to be jittery and easily flustered." The plan stated that "termination is likely" unless Marshall's pace

of work improved and she used an "acceptable barrier" for her "open sores." According to Houdesheldt, Marshall refused to sign the corrective action plan and left before the end of her shift.

After Marshall left, Houdesheldt and the clinic coordinator decided to terminate her employment. On March 14, 2012, Houdesheldt informed Marshall that EyeCare Specialties would no longer employ her.

To rebut the charge that she worked slowly, Marshall collected records for 13 days between February 2 and March 14, 2012, showing the number of patient examinations she and other technicians had performed. According to Marshall's records, she performed as many or more examinations than the other technicians on every day but one. The records do not show if these 13 days between February 2 and March 14 were the only days that she worked during that period.

## 4. Procedural Background

Marshall filed a complaint against EyeCare Specialties requesting damages under the Nebraska Fair Employment Practice Act (FEPA).[2] She claimed that EyeCare Specialties discriminated against her because of a "perceived disability." Specifically, she alleged that EyeCare Specialties regarded her as disabled because (1) "it became known that she had entered into substance abuse treatment prior to her employment," (2) she had "at-rest hand tremors," and (3) she had "a skin condition . . . that caused red marks on her skin."

The court sustained EyeCare Specialties' motion for summary judgment. In the fact section of the judgment, the court noted that the Nebraska Equal Opportunity Commission and the Lincoln Commission on Human Rights both denied the claims of discrimination that Marshall filed against EyeCare Specialties. In its analysis, the court concluded that Marshall had not presented any direct evidence that EyeCare Specialties

---

[2] See Neb. Rev. Stat. §§ 48-1101 to 48-1125 (Reissue 2010 & Cum. Supp. 2014).

discriminated against her because of a perceived disability. After deciding that Marshall had not presented direct evidence of discrimination, the court declined her invitation to analyze her claim under a mixed motive framework. It concluded that she had not created a material issue of fact under the *McDonnell Douglas Corp. v. Green*[3] three-part burden-shifting test.

## III. ASSIGNMENTS OF ERROR

Marshall assigns, consolidated, that the court erred by (1) citing the determination made by the Nebraska Equal Opportunity Commission and (2) determining that there was no genuine issue of material fact concerning whether EyeCare Specialties discriminated against her because it regarded her as disabled.

## IV. STANDARD OF REVIEW

[1,2] We affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[4] In reviewing a summary judgment, we view the evidence in the light most favorable to the party against whom the judgment was granted, and give that party the benefit of all reasonable inferences deducible from the evidence.[5]

## V. ANALYSIS

### 1. Nebraska Equal Opportunity Commission's Determination

Marshall assigns that the court "impermissibly relied on the findings of the [Nebraska Equal Opportunity Commission]

---

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[4] *Hughes v. School Dist. of Aurora*, 290 Neb. 47, 858 N.W.2d 590 (2015).

[5] *Id.*

in granting summary judgment." EyeCare Specialties argues that Marshall did not object to the admission of the commission's determination.

One sentence in the summary judgment order mentions the commission's determination: "On or about November 15, 2012, the Nebraska Equal Opportunity Commission closed its file on [Marshall's] Charge of Discrimination and found no reasonable cause to believe discrimination as alleged by [Marshall] had occurred." We note that in EyeCare Specialties' answer, it affirmatively alleged that Marshall had failed to exhaust administrative remedies. This purported defense might explain the court's brief mention of the administrative proceedings.

[3] Furthermore, Marshall did not object to the admission of the commission's determination. At the summary judgment hearing, the court asked Marshall if she had an objection and she said: "Judge, we don't object for purposes of this hearing. I did include in my brief my objection to the reference to the findings of the [Nebraska Equal Opportunity Commission], but we don't object to the Court considering it for the purposes of this hearing." If the party against whom evidence is offered fails to object to its introduction, that party waives whatever objection he or she might have had.[6] Marshall did not object to the court's considering the commission's determination for purposes of EyeCare Specialties' motion for summary judgment, so she cannot complain if the court actually considered the determination in its summary judgment order.

## 2. DISABILITY DISCRIMINATION

The FEPA[7] prohibits employers from discriminating against individuals because of certain protected characteristics,

---

[6] See, *Sturzenegger v. Father Flanagan's Boy's Home*, 276 Neb. 327, 754 N.W.2d 406 (2008); *R.W. v. Schrein*, 264 Neb. 818, 652 N.W.2d 574 (2002); *Jameson v. Liquid Controls Corp.*, 260 Neb. 489, 618 N.W.2d 637 (2000). See, also, *In re Estate of Clinger*, 292 Neb. 237, 872 N.W.2d 37 (2015).

[7] §§ 48-1101 to 48-1125.

including disability.[8] Section 48-1107.01 provides: "It shall be an unlawful employment practice for a covered entity to discriminate against a qualified individual with a disability because of the disability of such individual . . . ." Under § 48-1102(10)(a), a "[q]ualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." "Disability," under § 48-1102(9), is "(a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (b) a record of such an impairment, or (c) being regarded as having such an impairment."

The Legislature enacted the FEPA in 1965,[9] but it added the above-quoted language in §§ 48-1102 and 48-1107.01 in 1993.[10] The Legislature specifically intended that its 1993 amendments would provide the same protections from employment discrimination that title I of the Americans with Disabilities Act of 1990 (ADA of 1990) provided.[11] So it is appropriate to consider how federal courts have interpreted the counterparts to the 1993 amendments in the ADA of 1990.[12]

But in considering federal precedent, we must be mindful of subsequent amendments made by the Legislature and Congress. The Legislature has amended the disability provisions in the FEPA since 1993,[13] although the changes are not

---

[8] See § 48-1104.

[9] See 1965 Neb. Laws, ch. 276, pp. 782-98.

[10] 1993 Neb. Laws, L.B. 360.

[11] Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 329; *Arens v. NEBCO, Inc.*, 291 Neb. 834, 870 N.W.2d 1 (2015).

[12] *Arens v. NEBCO, Inc., supra* note 11. See *Father Flanagan's Boys' Home v. Agnew*, 256 Neb. 394, 590 N.W.2d 688 (1999). See, also, *Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720 (8th Cir. 2002).

[13] See, 2015 Neb. Laws, L.B. 627; 2004 Neb. Laws, L.B. 1083.

relevant here. And Congress substantially amended the ADA of 1990 in the ADA Amendments Act of 2008 (ADAAA of 2008).[14] For example, the ADAAA of 2008—unlike the ADA of 1990—provides that an employer can regard an individual as disabled even if the employer does not perceive the individual to be substantially limited in any major life activity.[15] But the Legislature has not adopted these federal amendments. So changes made by the ADAAA of 2008 are not indicative of the Legislature's intent in the FEPA, and we continue to look to federal decisions interpreting the language of the ADA of 1990.

[4] Below, Marshall alleged that EyeCare Specialties perceived her as disabled because she had sought treatment for drug abuse, because she had tremors, and because she had a skin condition. She claims that these impairments are disabilities under § 48-1102(9)(c), which states that an individual is disabled if she is "regarded as having such an impairment." The phrase "such an impairment" in § 48-1102(9)(c) refers to "a physical or mental impairment that substantially limits one or more of the major life activities of such individual" under § 48-1102(9)(a). So to show that EyeCare Specialties regarded her as disabled, Marshall had to demonstrate either (1) that despite having no impairment at all, EyeCare Specialties mistakenly believed that she had an impairment that substantially limited one or more major life activities, or (2) that she had a nonlimiting impairment that EyeCare Specialties mistakenly believed substantially limited one or more major life activities.[16]

---

[14] ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553.

[15] See 42 U.S.C. § 12102(3)(A) (2012).

[16] *Eshelman v. Agere Systems, Inc.*, 554 F.3d 426 (3d Cir. 2009). See *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999) (superseded by ADAAA of 2008); *Ollie v. Titan Tire Corp.*, 336 F.3d 680 (8th Cir. 2003).

The focus of the "regarded as" prong in § 48-1102(9)(c) is on the employer's beliefs and acts.[17] But it is not enough for Marshall to show that EyeCare Specialties treated her adversely because it believed she had physical or mental impairments.[18] Rather, she must show that EyeCare Specialties treated her adversely because it perceived her as having impairments that substantially limited one or more major life activities.[19]

[5-7] Turning to the mechanics of creating a fact question concerning disability, Marshall had two ways to survive EyeCare Specialties' motion for summary judgment. First, she could produce "direct evidence" of discrimination.[20] In this context, we have said that direct evidence "'consists of statements by a person with control over the employment decision "sufficient to prove discrimination without inference or presumption."'"[21] The statements must reflect a discriminatory or retaliatory attitude correlating to the discrimination complained of by the employee.[22] Direct evidence is not the converse of circumstantial evidence.[23] Instead it is evidence which shows "'a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually

---

[17] See 1 Jonathan R. Mook, Americans with Disabilities Act: Employee Rights & Employer Obligations § 3.04[1][a] (2015).

[18] See *Weber v. Strippit, Inc.*, 186 F. 3d 907 (8th Cir. 1999).

[19] *Id.* See *Bailey v. Georgia-Pacific Corp.*, 306 F.3d 1162 (1st Cir. 2002).

[20] See, *Griffith v. City of Des Moines*, 387 F.3d 733 (8th Cir. 2004); 2 Jonathan R. Mook, Americans with Disabilities Act: Employee Rights & Employer Obligations § 8.03[2][c][i] (2015).

[21] *Father Flanagan's Boys' Home v. Agnew, supra* note 12, 256 Neb. at 404, 590 N.W.2d at 695, quoting *Moore v. Alabama State University*, 980 F. Supp. 426 (M.D. Ala. 1997).

[22] *Id.*

[23] *Griffith v. City of Des Moines, supra* note 20.

motivated' the adverse employment action."[24] Alternatively, if Marshall lacks direct evidence, she must create a genuine issue of material fact by raising an inference of discrimination under the *McDonnell Douglas Corp.* tripartite burden-shifting framework.[25] Under that framework, (1) the plaintiff has the burden of proving a prima facie case of discrimination; (2) if the plaintiff proves a prima facie case, the burden shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action; and (3) if the employer articulates a nondiscriminatory reason for its action, the employee maintains the burden to persuade the fact finder that the stated reason was pretextual.[26]

### (a) Skin Condition and Tremors

Marshall argues that her skin condition was "a nonlimiting impairment" which EyeCare Specialties mistakenly believed substantially limited her major life activity of working.[27] She argues that she produced direct evidence that EyeCare Specialties was concerned about "contagion" between herself and patients because of her skin condition.[28] At oral argument, Marshall asserted that EyeCare Specialties also regarded her tremors as substantially limiting her major life activity of working.

[8] The FEPA does not define "physical or mental impairment," "substantially limits," or "major life activities."[29] Nor

---

[24] *Id.* at 736, quoting *Thomas v. First Nat. Bank of Wynne*, 111 F.3d 64 (8th Cir. 1997). See 2 Mook, *supra* note 20, § 8.03[2][c][ii].

[25] *Griffith v. City of Des Moines, supra* note 20. See, *Arens v. NEBCO, Inc., supra* note 11; *Fleming v. Civil Serv. Comm. of Douglas Cty.*, 280 Neb. 1014, 792 N.W.2d 871 (2011); 1 Barbara T. Lindemann & Paul Grossman, Employment Discrimination Law, ch. 13, § VII.A.3.b (4th ed. 2007 & Supp. 2008).

[26] See *Arens v. NEBCO, Inc., supra* note 11.

[27] Supplemental brief for appellant at 1.

[28] *Id.* at 2.

[29] See *Arens v. NEBCO, Inc., supra* note 11.

did the ADA of 1990.[30] But Marshall's skin condition and tremors are within the broad understanding of "'physical impairment'" or "'mental impairment.'"[31] Federal courts interpreted "'substantially limited'" to mean "'unable to perform'" or "'significantly restricted as to the condition, manner or duration.'"[32] The word "major" in "major life activities" means "important."[33] So "major life activities" are "those activities that are of central importance to daily life."[34] The ADA of 1990 did not delegate authority to any agency to define "disability,"[35] but the Equal Employment Opportunity Commission nevertheless promulgated regulations relied upon by courts.[36] The commission's regulations defined "major life activities" to include "'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'"[37]

[9] But if the major life activity under consideration was "working," courts required the plaintiff to show more than a perception that she was unfit for a particular job. In *Sutton v. United Air Lines, Inc.*,[38] the U.S. Supreme Court explained:

> To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps

---

[30] See *Sutton v. United Airlines, Inc., supra* note 16.

[31] See 1 Lindemann & Grossman, *supra* note 25, ch. 13, § IV.A at 822-23.

[32] *Wenzel v. Missouri-American Water Co.*, 404 F.3d 1038, 1041 (8th Cir. 2005). See *Sutton v. United Airlines, Inc., supra* note 16.

[33] *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002) (superseded by ADAAA of 2008).

[34] *Id.* See, also, 1 Lindemann & Grossman, *supra* note 25, ch. 13, § IV.B.

[35] *Sutton v. United Air Lines, Inc., supra* note 16.

[36] See, e.g., *Wenzel v. Missouri-American Water Co., supra* note 32.

[37] *Sutton v. United Air Lines, Inc., supra* note 16, 527 U.S. at 480, quoting 29 C.F.R. § 1630.2(i) (1998).

[38] *Sutton v. United Air Lines, Inc., supra* note 16.

not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.[39]

The plaintiff must show that she was "'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'"[40]

Here, Marshall presented direct evidence that EyeCare Specialties fired her because of her skin condition. She stated that Houdesheldt—an agent of EyeCare Specialties with decisionmaking power—told her in January 2012 that EyeCare Specialties' "'real concern is that you have sores on your arm.'" In February and March, Houdesheldt chastised Marshall for failing to cover her arms. The February 21 corrective action plan stated that Marshall's "sores are a concern as she performs tests that bring her in close proximity to patient's [sic] eyes." The March 13 corrective action plan, issued the same day that Houdesheldt and the clinic coordinator decided to terminate Marshall's employment, stated that Marshall had failed to create an "acceptable barrier" between patients and her "open sores."

Similarly, Marshall presented direct evidence that her tremors were a factor in EyeCare Specialties' decision to fire her. On January 26, 2012, Houdesheldt told Marshall that her "use of specialized tools in close proximity to patients' eyes while suffering from hand tremors could pose [a risk of] injury to patients and cause discomfort and alarm to patients during testing procedures." The February 21 corrective action plan, issued about 3 weeks before EyeCare Specialties terminated Marshall's employment, stated that Marshall's shaking was "a concern as she performs tests that bring her in close proximity to patient's [sic] eyes."

---

[39] *Id.*, 527 U.S. at 492.

[40] *Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 440 (8th Cir. 2007).

And Marshall created a material issue of fact as to whether EyeCare Specialties perceived her skin condition and tremors as substantially limiting her major life activity of working. We note that despite concerns about circularity,[41] courts interpreting the ADA of 1990 have generally accepted that working is a major life activity, and the parties do not dispute this conclusion.[42] Marshall presented direct evidence that EyeCare Specialties perceived her as unable to perform jobs which required her to have her arms near a patient's eyes or which required her to operate equipment near a patients' eyes. Given Marshall's employment background and training in medical services, there is at least a factual dispute whether such severe perceived restrictions on her ability to interact with patients would substantially limit her access to a class of jobs or broad range of jobs in various classes.[43]

### (b) Past Drug Abuse

In her complaint, Marshall alleged that EyeCare Specialties "perceived [her] as disabled as it became known that she had entered into substance abuse treatment prior to her employment." She argues on appeal that she was disabled because EyeCare Specialties "perceived [her] as chemically dependent."[44] She contends that EyeCare Specialties perceived this impairment as substantially limiting her major life activities of concentrating, thinking, communicating, and working.

Under the FEPA, the term "disability" does not include "psychoactive substance use disorders resulting from current illegal use of drugs."[45] Similarly, § 48-1102(10)(b) provides:

---

[41] See *Sutton v. United Air Lines, Inc., supra* note 16.

[42] See 1 Lindemann & Grossman, *supra* note 25, ch. 13, § IV.B.

[43] See *Moorer v. Baptist Memorial Health Care*, 398 F.3d 469 (6th Cir. 2005).

[44] Brief for appellant at 21.

[45] § 48-1102(9).

"Qualified individual with a disability shall not include any employee or applicant who is currently engaged in the illegal use of drugs when the covered entity acts on the basis of such use[.]" But an individual who is otherwise a qualified individual with a disability does not lose that status because of past drug abuse or a misperception of current illegal drug use. Section 48-1102(10)(c) states:

Nothing in this subdivision shall be construed to exclude as a qualified individual with a disability an individual who:

(i) Has successfully completed a supervised drug rehabilitation program or otherwise been rehabilitated successfully and is no longer engaging in the illegal use of drugs;

(ii) Is participating in a supervised rehabilitation program and is no longer engaging in such use; or

(iii) Is erroneously regarded as engaging in such use but is not engaging in such use.

Section 48-1102(10)(b) and (c) closely track language in the ADA of 1990.[46]

Federal courts have at times been less than consistent in their treatment of drug addiction and perceived drug addiction. A few cases seem to hold that addiction is a disability without determining whether, on the facts of the case, the plaintiff's addiction substantially limited one or more major life activities or was perceived to have such an effect by the employer.[47] But

---

[46] Compare § 48-1102(10)(b) and (c), with 42 U.S.C. § 12114(a) and (b) (2006).

[47] See, *Pugh v. City of Attica, Indiana*, 259 F.3d 619 (7th Cir. 2001); *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182 (9th Cir. 2001); *Duda v. Franklin Park Pub. School Dist. 84*, 133 F.3d 1054 (7th Cir. 1998); *Buckley v. Consolidated Edison Co. of New York*, 127 F.3d 270 (2d Cir. 1997), *vacated* 155 F.3d 150 (2d Cir. 1998); *Miners v. Cargill Communications, Inc.*, 113 F.3d 820 (8th Cir. 1997), citing *Crewe v. U.S. Office of Personnel Management*, 834 F.2d 140 (8th Cir. 1987); *Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996).

the greater weight of authority is that the plaintiff must show that his or her particular addiction, or perceived addiction, in fact substantially limited, or was perceived to substantially limit, a major life activity.[48]

[10] We agree with the majority view and hold that while drug addiction is an impairment,[49] it is not a disability under the FEPA unless it substantially limits a major life activity or is perceived by the employer to substantially limit a major life activity. The majority rule is consistent with the principle that whether a person has a disability is an individualized inquiry.[50] Courts have been reluctant to recognize particular impairments as "per se" disabilities without testing whether the impairment actually limits one of the plaintiff's major life activities.[51]

### (i) No Direct Evidence of Disability Discrimination for Past Drug Abuse

Turning to the summary judgment record, we conclude that Marshall did not present direct evidence that EyeCare

---

[48] See, *Dovenmuehler v. St. Cloud Hosp., supra* note 40; *Moorer v. Baptist Memorial Health Care, supra* note 43; *Sullivan v. Neiman Marcus Group, Inc.*, 358 F.3d 110 (1st Cir. 2004); *Bailey v. Georgia-Pacific Corp., supra* note 19; *Zenor v. El Paso Healthcare System, Ltd.*, 176 F.3d 847 (5th Cir. 1999); *Nielsen v. Moroni Feed Co.*, 162 F.3d 604 (10th Cir. 1998); *Wallin v. Minnesota Dept. of Corrections*, 153 F.3d 681 (8th Cir. 1998); *Burch v. Coca-Cola Co.*, 119 F.3d 305 (5th Cir. 1997). See, also, Renee Parsons & Thomas J. Speiss III, *Does the Americans with Disabilities Act Really Protect Alcoholism?* 20 Lab. Law. 17 (2004).

[49] See *Bailey v. Georgia-Pacific Corp., supra* note 19.

[50] See, *Sutton v. United Air Lines, Inc., supra* note 16; 1 Lindemann & Grossman, *supra* note 25, ch. 13, § V.

[51] See, *Griffin v. United Parcel Service, Inc.*, 661 F.3d 216 (5th Cir. 2011); *E.E.O.C. v. Lee's Log Cabin, Inc.*, 546 F.3d 438 (7th Cir. 2008); *Weber v. Strippit, Inc., supra* note 18; *Deas v. River West, L.P.*, 152 F.3d 471 (5th Cir. 1998). See, also, *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275 (11th Cir. 2001).

Specialties discriminated against her because it perceived her to be a drug addict. Marshall cites statements from coworkers reporting that Marshall was "taking some type of pill" and urging EyeCare Specialties to start random drug testing. Marshall concedes, however, that these are not "statements by the decision makers directly."[52] Nor does she argue that the decisionmakers adopted the statements as their own simply by recording them. References to Marshall's being "jittery" or "flustered" do not establish a specific link between any "'[d]iscrimination in the air'" and the termination of Marshall's employment.[53] Statements by decisionmakers unrelated to the decisional process itself are not direct evidence.[54] The only arguable item of direct evidence is an administrator's suggestion in June 2007 that Marshall set her pill bottles where others could see them. But that evidence is stale because more than 4 years passed between the statement and the termination of Marshall's employment.[55]

### (ii) No Question of Fact Under
### McDonnell Douglas Corp.
### for Past Drug Abuse

[11] Because she lacks direct evidence, Marshall's drug addiction claim must withstand EyeCare Specialties' summary judgment motion under the *McDonnell Douglas Corp.* framework. The first step is for Marshall to establish a prima facie case. Section 48-1107.01 prohibits an employer from taking an adverse employment action against a qualified individual with a disability because of the individual's disability. Section 48-1102(10)(a) states that a qualified individual with a disability is a person with a disability who, with or without reasonable

---

[52] Brief for appellant at 24.

[53] See 2 Mook, *supra* note 20, § 8.03[2][c][ii] at 8-64.

[54] *Father Flanagan's Boys' Home v. Agnew, supra* note 12.

[55] See *Brown v. City of Jacksonville*, 711 F.3d 883 (8th Cir. 2013).

accommodation, can perform the essential functions of the job. So to establish a prima facie case of disability discrimination under the FEPA, Marshall must show that (1) she was disabled, (2) she could perform the essential functions of the position with or without reasonable accommodation, and (3) EyeCare Specialties subjected her to an adverse employment action because of her disability.[56]

The first element in Marshall's prima facie case is that she had a disability as that term is understood in the FEPA. Drug addiction is an impairment,[57] and there is some evidence that viewed in the light most favorable to Marshall, would show that EyeCare Specialties perceived Marshall as a drug addict. Marshall told her coworkers that she lost her nursing license because she abused prescription drugs, and her coworkers informed administrators and supervisors of Marshall's history of chemical dependence. In January 2012, one of Marshall's coworkers told Houdesheldt that Marshall had said she "had a history of substance abuse."

But, again, Marshall must still present evidence that EyeCare Specialties perceived her drug addiction as substantially limiting a major life activity for the impairment to be a disability under the FEPA. As to the major life activity of working, the record lacks evidence that EyeCare Specialties regarded Marshall's addiction as precluding her from a substantial class or broad range of jobs. There is no evidence of how such a perceived limitation would affect Marshall's employment prospects given her particular skills and background.

In addition to working, Marshall argues that EyeCare Specialties perceived her as substantially limited in the

---

[56] See, *Kozisek v. County of Seward, Nebraska*, 539 F.3d 930 (8th Cir. 2008); *RGR Co. v. Lincoln Commission on Human Rights*, 292 Neb. 745, 873 N.W.2d 881 (2016); *Doe v. Board of Regents*, 287 Neb. 990, 846 N.W.2d 126 (2014); *IBP, inc. v. Sands*, 252 Neb. 573, 563 N.W.2d 353 (1997).

[57] See *Bailey v. Georgia-Pacific Corp., supra* note 19.

major life activities of concentrating, thinking, and communicating. These activities—now included in the federal definition of "major life activities" because of the ADAAA of 2008[58]—did not appear in the Equal Employment Opportunity Commission's regulations interpreting the ADA of 1990, although the commission's compliance manual stated that thinking, concentrating, and interacting with others were major life activities.[59] Most courts interpreting the ADA of 1990 held that thinking[60] and communicating[61] were major life activities. Courts were divided over whether concentrating was a major life activity.[62]

---

[58] See 42 U.S.C. § 42-12102(2)(A) (2012).

[59] See *E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606 (5th Cir. 2009).

[60] *Id.*; *Shaver v. Independent Stave Co.*, 350 F.3d 716 (8th Cir. 2003); *Taylor v. Phoenixville School Dist.*, 184 F.3d 296 (3d Cir. 1999); *Miller v. Hersman*, 759 F. Supp. 2d 1 (D.D.C. 2010); *E.E.O.C. v. Voss Elec. Co. d/b/a Voss Lighting*, 257 F. Supp. 2d 1354 (W.D. Okla. 2003); *E.E.O.C. v. Dollar General Corp.*, 252 F. Supp. 2d 277 (M.D.N.C. 2003). But see *Starks-Umoja v. Federal Express Corp.*, 341 F. Supp. 2d 979 (W.D. Tenn. 2003).

[61] See, *Ray v. Kroger Co.*, 264 F. Supp. 2d 1221 (S.D. Ga. 2003); *E.E.O.C. v. Voss Elec. Co. d/b/a Voss Lighting, supra* note 60; *E.E.O.C. v. Dollar General Corp., supra* note 60; *Downing v. United Parcel Service, Inc.*, 215 F. Supp. 2d 1303 (M.D. Fla. 2002). See, also, *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12 (1st Cir. 1997).

[62] See, *Miller v. Hersman, supra* note 60. Compare *Battle v. United Parcel Service, Inc.*, 438 F.3d 856 (8th Cir. 2006), *Gagliardo v. Connaught Laboratories, Inc.*, 311 F.3d 565 (3d Cir. 2002), *Sussle v. Sirina Protection Systems Corp.*, 269 F. Supp. 2d 285 (S.D.N.Y. 2003), *Walsted v. Woodbury County, IA*, 113 F. Supp. 2d 1318 (N.D. Iowa 2000), *DeMar v. Car-Freshner Corp.*, 49 F. Supp. 2d 84 (N.D.N.Y. 1999), and *Bitney v. Honolulu Police Dept.*, 96 Haw. 243, 30 P.3d 257 (2001), with *Pack v. Kmart Corp.*, 166 F.3d 1300 (10th Cir. 1999), *Starks-Umoja v. Federal Express Corp., supra* note 60, *Lemire v. Silva*, 104 F. Supp. 2d 80 (D. Mass. 2000), *Phillips v. Wal-Mart Stores, Inc.*, 78 F. Supp. 2d 1274 (S.D. Ala. 1999), and *Hook v. Georgia-Gulf Corp.*, 788 So. 2d 47 (La. App. 2001).

[12] We conclude that concentrating, thinking, and communicating are major life activities under the FEPA. As noted, major life activities are activities of central importance to daily life.[63] A substantial limitation on one's ability to concentrate, think, or communicate is a great debility, preventing one from understanding the symbols, reasoning, and customs necessary to interact with the world and the people in it. Some courts have reasoned that concentrating itself is not a major life activity because it is as an aspect of other activities, like working or learning.[64] But there is no reason to demote concentration because it is necessary for other life activities. If anything, the fact that an individual must concentrate to perform a multitude of functions shows its importance.

But the evidence, even viewed in the light most favorable to Marshall, does not support a reasonable inference that EyeCare Specialties perceived Marshall as having a drug addiction that substantially limited her ability to concentrate, think, or communicate. That is, Marshall did not meet the first element of her prima facie case under *McDonnell Douglas Corp.* requiring her to show she has a "disability" as that term is defined by the FEPA. Marshall urges us to assume that references to her being confused, flustered, or unable to multitask were veiled references to her history of substance abuse. We decline her invitation because there is more than one reason why a person may be confused, flustered, or bad at multitasking and the record does not suggest an inference that the perceptions were based on Marshall's past abuse of prescription drugs. We will not simply assume that because Marshall told her coworkers about her prior abuse of prescription drugs, any abnormalities in her behavior were perceived by her employer as the effects of addiction.

---

[63] See *Toyota Motor Mfg., Ky., Inc. v. Williams, supra* note 33.

[64] See, *E.E.O.C. v. Chevron Phillips Chemical Co., LP, supra* note 59; *Pack v. Kmart Corp., supra* note 62.

## VI. CONCLUSION

We withdraw our opinion filed on July 2, 2015. Marshall presented direct evidence that EyeCare Specialties terminated her employment because of her skin condition and tremors, both of which EyeCare Specialties perceived to substantially limit Marshall's major life activity of working. But she failed to present evidence, direct or indirect, that EyeCare Specialties perceived her as having a drug addiction that substantially limited one or more major life activities. We therefore affirm the summary judgment as to Marshall's drug addiction claim. We reverse, and remand for further proceedings for Marshall's claims related to her skin condition and tremors.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

WRIGHT and STACY, JJ., not participating.